**AUSTIN, Commissioner, v. NEIMAN et al.**
(No. 969–5107.)

Commission of Appeals of Texas, Section B.
March 13, 1929.

Frazier & Averitte, of Hillsboro, and Spencer & Rogers, of San Antonio, for plaintiff in error.

J. E. Clarke, of Hillsboro, and Joe W. Hale, of Waco, for defendants in error.

LEDDY, J. This is a suit by the state banking commissioner, as statutory receiver of the First State Bank of Malone, an insolvent bank, against Robert A. Neiman, former bookkeeper and assistant cashier of said bank, and the Maryland Casualty Company, to recover upon a fidelity bond in the sum of $2,000 given by Neiman to protect the bank against misapplication, wrongful abstraction, and embezzlement of its funds during the course of his employment.

In a trial by the court without the intervention of a jury, judgment was entered denying plaintiff in error a recovery on the bond, and this judgment was affirmed by the Court of Civil Appeals.

The undisputed evidence showed that S. E. Lowe, the bank's president, pleaded guilty to embezzlement of the bank's funds on several charges, and served a term in the penitentiary. The suit against Neiman was predicated upon the fact that he, as bookkeeper, aided and assisted Lowe in wrongfully converting the bank's funds by so keeping the books as to keep them in balance, notwithstanding the fact that $40,000 of its liabilities to its customers were removed from the books over a period of several months and placed in a dummy ledger, during which time the said Lowe abstracted $40,000 in cash belonging to the bank, and appropriated it to his own use and benefit.

By proper assignment plaintiff in error complains of the judgment of the trial court denying a recovery on the bond of Robert A. Neiman because the uncontradicted evidence showed that he kept the individual ledger and placed on the general ledger from time to time the daily totals of the individual deposits and overdrafts reflected by the individual ledger, which said totals corresponded with the totals on the cash book, and it was physically impossible for some 50 to 75 individual ledger sheets representing total deposits of approximately $40,000 to get out of the individual ledger without his knowledge, consent, and assistance.

A careful consideration of the record convinces us that this assignment should be sustained. It appears that the scheme through which Lowe was enabled to embezzle more than $40,000 of the bank's funds was by means of what is termed a "dummy" ledger. This ledger was composed of a group of individual ledger sheets or accounts of various depositors in the bank which had been removed from the live and current ledger, so that the total sum of the bank's deposits had been decreased $40,000. Notwithstanding the removal of these sheets, it appears that the books of the bank were so kept that the total of the individual deposits was carried forward on what was known as the general ledger, in a sum less the amount represented by the $40,000 which was in the dummy ledger. Neiman was the bank's bookkeeper, and kept the individual ledger, which contained the sheets from which the sheets composing the dummy ledger had been removed. It seems that, when a ledger sheet was taken from the active ledger, the amount of the customer's balance on the sheet so removed was taken in cash by Lowe, the president of the bank.

Upon the trial Neiman admitted that he took what is called a "long shot" every 2 weeks or 30 days. By that is meant that he took the sum total of all the balances of all individual deposits as shown by the active ledger in order to ascertain whether or not the amount of the individual deposits as carried on the bank ledger corresponded with the amount of individual deposits as reflected by the total sum of all the individual personal accounts. It is not disputed that, when a sheet was removed from the individual ledger and placed in the "dummy," it would necessarily be discovered by the bookkeeper the next time he took a long shot, for the reason that the total sum of all his deposits would be as much less the amount carried on his general ledger as the sum of the removed sheets; that is to say, if a sheet was removed containing an account with a balance of $1,000, when he took a long shot, he would run out $1,000 short of his general ledger, and thereby would be put upon notice that a $1,000 sheet was misplaced.

We think it conclusively shown that the sheets composing the dummy ledger were not all removed at the same time, but that they were removed over a period of several months. The general ledger was in Neiman's individual handwriting, and it never at any time showed a decrease in deposits of $40,000. There was only a few thousand dollars decrease at any one time, but there was shown a gradual decline in deposits for about 2 years prior to the date the bank was closed. When the dummy ledger was discovered in the vault after the bank was closed, it contained sheets covering individual accounts totaling more than $40,000, which, when added to the deposits of $60,000, shown by the general ledger ran the deposits up to their former standard of approximately $100,000.

Defendant in error Neiman testified as a witness, denying any personal knowledge of the dummy ledger until after the bank was closed. He admitted, however, that he kept the individual ledger, posted the books, and deposits, ran his long shot at stated intervals, and posted the totals of individual deposits on the general ledger. He also testified that during the 2 years preceding the closing of the bank the books kept by him were never out of balance by more than $50 at any one time.

We think that, under the system used by Lowe to embezzle the bank's funds, it was physically impossible for Neiman not to have discovered the unlawful abstraction of the bank's funds that was being carried on for a period of several months. Every time a sheet was lifted from the live individual ledger and placed in the dummy ledger a corresponding amount of cash was taken from the bank by Lowe. The bank's individual deposits would thus be reduced to the amount of the total deposits on the sheet so removed and the general ledger in fact showed a corresponding reduction. It appears that the individual and the general ledger kept by Neiman were, during all the time this pilfering was going on, in perfect balance. The general ledger which was kept in Neiman's own handwriting showed no changes or erasures. The taking of the long shot once or twice a month must necessarily have disclosed to Neiman the repeated shortages that were taking place, and yet, in the face of the continuous lifting of deposit sheets and thus reducing the deposits of the bank, the general ledger and individual ledger were kept in constant balance. This result could only have been accomplished by the making of false entries on the general ledger by Neiman.

Several of the bank examiners testified that, when they first took over the bank, Neiman admitted to them his guilty knowledge of the keeping of the dummy ledger. He, however, vigorously denied that he made any such admission to the examiners. The defendant in error, Maryland Casualty Company, offered in evidence Neiman's testimony upon a former trial of this case, from which it appears he testified:

"Mr. Lowe told me in November that the bank was short about twenty-four or twenty-five thousand dollars, and that he had the money to take care of it; had it fixed up; but how, I don't know; I did not ask him. * * * He told me he had gotten the money in Dallas, but he did not tell me how he had fixed it up. I believed what he said, and thought the matter was all right, and then continued my employment in the bank."

It was further shown that in such former testimony he testified with reference to the posting of checks against individual customers' accounts as follows:

"In keeping the books, I had to have the checks in my hand that were sent in before I could run them through the books. I received each and every check that came into the bank. I charged each check to the account of the man who drew it. * * * It was my business to put every check on the books that went on the books for the three years that I was there. I had to be familiar with the accounts. I had to work with them daily and I did do that. If an account was active at all it was such by means of my handling the checks."

It was undisputed that a great many of the sheets placed in the dummy ledger covered active accounts; that is, accounts against which checks were being constantly drawn, and it appears that these checks were properly posted on the sheets in the dummy ledger. It would have been physically impossible for numerous checks to come into the teller's window, and be passed back to Neiman for entry on the customers' individual sheets over a period of several months without his

discovering that the sheets covering individual accounts had been abstracted from the individual ledger. Manifestly, it would have been impossible for the president of the bank to have known when numerous checks would be presented against accounts which happened to be in the dummy ledger so as to keep said checks from coming into possession of Neiman for posting, and, if they did come into his possession, he is bound to have discovered that the sheets upon which they were to be charged were missing from the individual ledger.

The decision of the Court of Civil Appeals that there was evidence to sustain the court's implied finding that Neiman did not aid and assist Lowe in the embezzlement of the bank's funds seems to be largely predicated upon the answer of one of the bank examiners to a hypothetical question propounded to him upon the trial as to how Lowe's shortage could have occurred without Neiman having knowledge thereof. The witness answering such question said:

"If S. E. Lowe had lifted out of the individual ledger out in the bank, a customer's ledger sheet that showed that he had $500 in the bank, and put that sheet in the dummy ledger in the vault, and gone to some other account on that ledger and credited that with $500, the books of the bank would still balance. There wouldn't have been any shortage shown by that transaction. If a week later he would debit that particular account with $500, that would then show the true condition of that customer's account. If at the same time he was to credit cash for $500 and put the money in his pocket, the books would still balance. The customer's individual ledger sheet out in the ledger would be correct, and the books would still be in balance, and Mr. Lowe would have $500 of the bank's money."

The judgment cannot be sustained on this theory, for the reason that the record contains no evidence whatever tending to show that the amount of deposits shown by any ledger sheet placed in the dummy was credited on any other account. It was not shown that upon a single live ledger sheet there had been entered a false credit for the amount of a lifted ledger sheet which was later reduced by a false charge ticket. This was purely a speculative theory which finds no support in the evidence. Besides, if Lowe had carried on his embezzlement of the bank's funds in the way indicated by the hypothetical question, there would have been no necessity for lifting the live ledger sheets and placing them in a dummy ledger. It would only have been necessary to have made a false credit on a customer's individual sheet and reduced same by a false charge ticket. Moreover, if such method had been pursued, with the large number of accounts

in the dummy ledger, it would at least have been discovered after the bank was closed, and a careful check of the books made by those in charge thereof.

In the face of evidence indisputably showing the method by which the shortage took place, it is useless to indulge a fanciful theory that it might have occurred in another and different way. In determining whether there is any evidence to sustain a finding, we must confine ourselves "within the field of evidence to the utmost bounds of reason which rational men of common sense might know without passing beyond the line between the field of probability and the field of conjecture." 23 C. J. p. 53, § 1795; Hollenback v. Stone & Webster Engineering Corp., 46 Mont. 559, 129 P. 1058; Lehane v. Butte Electric Co., 37 Mont. 564, 97 P. 1038; Mickuczauski v. Helmholz Mitten Co., 148 Wis. 153, 134 N. W. 369.

In our opinion, the evidence conclusively established that Lowe embezzled the bank's funds during a period of several months through the method of removing sheets covering customers' individual accounts from the active ledger and placing them in the dummy ledger, and subsequently appropriated to his own use the amount of the bank's funds covered by the sheets thus removed. Under Neiman's own admission, it would have been impossible, if such system was in fact used, for him not to have discovered the shortage whenever he took his long shot.

While trial courts are allowed a wide latitude in determining the credibility of witnesses and the weight to be given to their testimony, this does not go to the extent of permitting the testimony as to a given fact to be allowed weight when the undisputed physical facts show that it is impossible for such testimony to be true.

It being established beyond controversy that Neiman aided and assisted Lowe in the unlawful appropriation of the bank's funds, the conditions of his bond were violated; hence a recovery thereon should not have been denied.

We therefore recommend that the judgments of the trial court and the Court of Civil Appeals be reversed, and that judgment be rendered in favor of plaintiff in error against defendants in error for the amount sued for, and also that judgment be rendered in favor of defendant in error Maryland Casualty Company against its codefendant Neiman for the amount awarded against it.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed, and judgment rendered for plaintiff in error against both defendants in error, with judgment in favor of the Casualty Company against defendant in error Neiman, as recommended by the Commission of Appeals.