**APPALACHIAN ELECTRIC POWER CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 4229.

Circuit Court of Appeals, Fourth Circuit.
Jan. 4, 1938.

**986**

George D. Gibson and T. Justin Moore, both of Richmond, Va. (Hunton, Williams, Anderson, Gay & Moore, and E. Randolph Williams, all of Richmond, Va., on the brief), for petitioner.

Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, and Thomas I. Emerson and Laurence A. Knapp, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

PARKER, Circuit Judge.

This case arises upon a petition of the Appalachian Electric Power Company for review of an order of the National Labor Relations Board. The petitioner is a Virginia corporation engaged in generating, transmitting, and distributing electric power. It owns and operates nine generating plants in Virginia and West Virgina, all of which are connected with a main transmission line over which current is transmitted to consumers in various parts of the two states. The instant case arose at petitioner's steam generating plant at Glen Lyn, Va., which consumes annually 300,000 or more tons of coal shipped to it chiefly from West Virginia, and which generates current that is carried on the main transmission line to the petitioner's customers. Any interruption of the production of electric current at Glen Lyn would affect the transmission in interstate commerce of the current which it produces and of the coal used in producing it.

The case was commenced before the Board by a complaint filed in behalf of International Brotherhood of Electrical Workers, Local Union No. 906, charging that petitioner had engaged in and was engaging in unfair labor practices affecting commerce, within the meaning of section 8, subdivisions (1) and (3), of the National Labor Relations Act, 49 Stat. 449, 452, 29 U.S.C.A. § 151 et seq., and section 158 (1, 3), in that since July 5,. 1935, petitioner had refused reinstatement to twelve former employees. The Board held that petitioner was guilty of unfair practices in that on June 1, 1936, and January 1, 1937, it had promoted three laborers hired since July 5, 1935, instead of offering to former employees, whose connection with petitioner had been terminated prior to that date, the positions to which the laborers were promoted. Order was entered finding that this amounted to unfair discrimination in regard to hire against the former employees on account of former union affiliation and activity and to interference with and restraint and coercion of employees in the exercise of the rights of self-organization guaranteed by section 7 of the act, 29 U.S.C.A. § 157. A cease and desist order was entered and petitioner was directed to offer employment to three of the former employees in order of seniority, with back pay from the respective dates upon which it had promoted the laborers. The pertinent facts, as to which there is little if any dispute, are as follows:

Prior to January 19, 1935, petitioner employed sixty-seven men in its plant at Glen Lyn, but on that date it closed down the plant retaining a mere skeleton force and laying off all of the other employees. Although the men at this time were en-

gaged in the formation of a union, the Board finds that the closing down of the plant had nothing to do with this union activity, but was the result of plans which had been determined upon by petitioner some time before. With respect thereto, the Board made the following finding:

"At midnight of January 19-20, 1935, the Glen Lyn plant was shut down for an indefinite period. Although this action followed within two days of the first organization meeting of the Union, we find that it was based solely on business reasons unrelated to the union activities of the respondent's employees. The respondent wished to make certain improvements to the equipment at the plant. Contractors' proposals for these improvements had been received by the respondent in October, 1934, and the new equipment had arrived at the plant between January 1 and 15, 1935. In addition, the respondent had been engaged for some time in a controversy over freight rates with the two railroads which shipped its coal. It was believed that the railroads were maintaining excessive rates because they considered the respondent dependent upon the plant. The respondent thought that a shut-down demonstrating that the system could run without Glen Lyn would help in securing a rate reduction. Finally, because of a drop in demand on the system as a whole, combined with the fact that the generating capacity of the hydro-electric plants, which fluctuates with the flow of the streams, was usually near its high about January of each year.

"The possibility of this shut-down, for the reasons stated above, had been forecast in a talk to the employees by Mr. Markle, division manager, about January 5. Notice of the shut-down was given on January 19, at which time Lugrin, the plant manager, also listed the 43 or 44 men who were to be laid off. A skeleton crew was retained. All of the men named in the complaint, except L. W. Wall, were laid off at this time. A. P. Clark was rehired for construction work on January 22, but he was dropped on January 28, and his records indorsed, 'Work completed.' L. W. Wall was retained on the skeleton crew and continued until January 31, when he was dropped ostensibly for the same reason.

"The shut-down was expected to be temporary. But, according to the respondent's officials, they intended to remove definitely from the payroll all the men laid off, although they expected to recruit the staff from among such men on reopening. At the hearing there was considerable contention as to whether the laying off of the employees terminated their employee status. It was pointed out that the term 'discharge' was not used, and it appears that upon reopening those who were put back to work resumed their seniority status. On the other hand, there was no evidence that the men were told they would be called back later, as had been customary when individual employees were temporarily laid off in previous slack periods. Moreover, the records of the respondent for each employee laid off were indorsed, under the heading 'Date dropped', with the notation '1/19/35', and, under the heading 'Reason,' with the notation 'Services no longer needed.' It appears unnecessary to determine whether the employee status of the ex-employees ended at this time. For the purposes of this decision it may be conceded that it terminated some time prior to July 5, 1935, when the National Labor Relations Act went into effect."

On March 2, 1935, the plant was reopened and fifty-one of the sixty-seven former employees were taken back. Employment was found for four others in another plant of petitioner at Roanoke. Among the fifty-one given employment at Glen Lyn, twenty-one were men who had joined the union, although their membership was dropped on re-employment. Ten of the twelve not employed were union men. Following the opening of the plant, the twelve unemployed picketed the plant for a short while attempting to force their re-employment; and in this they were joined by the president of the union, who resigned the position which had been given him upon the reopening. There was never any interruption of the work of the plant, however; and for several months prior to the passage of the National Labor Relations Act even this picketing had stopped and the discharged employees had accepted the severance of their employment as an accomplished fact. They had ceased, moreover, to pay dues to the union and the charter of the local had been canceled; and, while shortly before the hearing before the Board they were granted reinstatement by the union, there is nothing to show that they were members at the time of the promotions of which complaint is made.

There is no question but that the reduction in the working force at the Glen

Lyn plant was made bona fide for business reasons. The Board found that petitioner was opposed to unionization and that the high percentage of union men thrown out of employment as a consequence of the reduction evidenced discrimination on account of union membership; but the Board properly held that, as this occurred prior to the passage of the act, it could not be made the basis of complaint against petitioner.

Following the passage of the act, no additional men were employed at Glen Lyn until August, 1935. At that time four employees who had been working at Kenova and who were no longer needed there were transferred to Glen Lyn. The Board found nothing unfair in this transfer and bases no action thereon, and with respect to it the trial examiner in his report said:

"So far as the employment of the men brought over from Kenova is concerned the undersigned finds that the facts in evidence do not support a charge of discriminatory hiring. The men involved were already employees. No presumption of anti-union bias would overcome the natural expectancy that men with such long service records would be continued in employment at some other plant of the same employer when their services were no longer needed at Kenova."

The Board, in short, finds no unfair practice within the meaning of the act in any action of the petitioner except in the promotion of the three laborers to which we have referred. The facts with respect to their promotion are as follows: On June 1, 1936, one R. D. Spangler, who had been employed on January 6, 1936, for special construction work on a boiler, was promoted to the position of boiler room man; and, on January 1, 1937, G. T. Powell and R. D. Doss, employed as laborers on June 29, 1936, and September 20, 1936, respectively, were promoted to positions in the turbine room. The Board found discrimination in these promotions because the positions to which these laborers were promoted were given to them instead of to the former employees who prior to January 19, 1935, had held positions of this character. It appeared that ten of these former employees were still living at or near the village of Glen Lyn at the time of these promotions and that most of them had not obtained equivalent employment following their discharge. Only two of them, however, had made application for re-employ-

ment after the picketing in 1935; and these two had made application when no positions were available. Petitioner denied any intent to interfere with the right of self-organization on the part of employees or to discriminate against former employees in making these promotions.

■ We agree with the Board that the business in which petitioner is engaged is of such a character that any unfair labor practice with respect to its employees engaged in the production of electric current at the Glen Lyn plant would be brought within the jurisdiction of the Board as an unfair labor practice affecting commerce within the meaning of the National Labor Relations Act. National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352; Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 136; National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 91 F.2d 509. And we think that the Board's finding that the petitioner was opposed to the unionization of its employees "by any organization with outside affiliations" is unquestionably correct. We do not find any support, however, for the finding that the promotion of the three laborers on June 1, 1937, and January 1, 1937, was a discrimination against former employees on account of union affiliation or activity and was an interference with and restraint and coercion of employees in the exercise of the rights of self-organization and collective bargaining.

■ As the Board correctly found, the former employees had ceased to be employees of petitioner prior to the passage of the National Labor Relations Act; and, assuming without deciding that it constitutes an unfair practice under the act to refuse because of prior labor affiliations or activities to employ one who is not at the time an employee, we find nothing in the record to justify the conclusion that anything of the sort occurred with respect to the promotions of the laborers. When the first promotion occurred, the former employees of the company had been out of its service for nearly eighteen months and, at the time of the other two, for nearly two years; and it was certainly more reasonable that the managers and foremen of the plant should give available positions to men who were working with them every day, and for whom they presumably entertained

friendly feelings, than that they should re-hire men who had been for so long out of the service. Any inference of discrimination or of interference with the right of self-organization merely because of such promotion, therefore, is not justified. The act does not attempt to regulate the employer's control of his business in the employment, promotion, or discharge of employees so long as he does not attempt thereby to interfere with the right of self-organization of the employees or to intimidate or coerce them. As said by the Supreme Court in the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 628, 81 L. Ed. 893, 108 A.L.R. 1352: "The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them." A fortiori it does not interfere with his right to promote them.

We are bound by the Board's findings of fact as to matters within its jurisdiction, where the findings are supported by substantial evidence; but we are not bound by findings which are not so supported. 29 U.S.C.A. § 160(e) (f); Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 650, 81 L.Ed. 965. The rule as to substantiality is not different, we think, from that to be applied in reviewing the refusal to direct a verdict at law, where the lack of substantial evidence is the test of the right to a directed verdict. In either case, substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences. Cf. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339-343, 53 S.Ct. 391, 393, 394, 77 L.Ed. 819. If the case had been tried at law, we should unhesitatingly hold that verdict should have been directed against a finding of discrimination or interference, on the ground that no sufficient evidence to that effect had been produced; and for the same reason we must set aside the order of the Board based on such a finding. It is worthy of note that the promotions relied on by the Board as the basis of its order were not so much as mentioned in the complaint filed with it, which proceeded on the theory that there was discrimination because of the refusal to reemploy the former employees upon the reopening of the plant or at least upon the passage of the act.

Reversed.