## MAGNOLIA PETROLEUM CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 9382.

Circuit Court of Appeals, Fifth Circuit.

June 13, 1940.

Samuel C. Lipscomb, of Beaumont, Tex., and Ross F. Madole and Walace Hawkins, both of Dallas, Tex., for petitioner.

Charles Fahy, General Counsel, National Labor Relations Board, Robert B. Watts, Associate General Counsel, National Labor Relations Board, and Ruth Weyand, Atty., National Labor Relations Board, all of Washington, D. C., for respondent.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

This is a proceeding, on the one hand to review and set aside, on the other to enforce, an order of the Labor Board. Like so many others which have been brought before this and other Circuit Courts of Appeals, this proceeding takes its spring from long continued and unsuccessful efforts of a nationally affiliated labor union to organize and exclusively represent workers in a plant which has and has had, a local unaffiliated labor organization. Here, as in all the similar cases, the national union makes and the Board sponsors the charge that the local unaffiliated union is not the result of self-organization of the employees but of unfair labor practices on the part of the employer in dominating and

interfering with or contributing support to it. The proceeding arose in this way. On April 2, 1938, local union 243, an affiliated organization, filed a petition requesting investigation and certification of representatives and on April 11, four days after the Independent was formed, the local filed charges with the Regional Director that petitioner had engaged in and was engaged in certain unfair labor practices in forming, dominating and contributing to the Independent.

On April 30, the Board authorized the Regional Director to conduct an investigation and provide for a hearing in the certification proceeding, and on May 9, the Employee's Independent Union of Magnolia Refinery workers appeared, claiming to represent employees directly affected by the investigation. Whereupon, on motion made by counsel for the Board and joined in by counsel for local No. 243, the trial examiner postponed the hearing and on May 16, the Board ordered the representation proceeding and the proceeding arising from the charges filed by local No. 243, to be consolidated for the purpose of the hearing. As the result of that hearing, the Board made the findings and order which are attacked in this case.

■ Petitioner here insists that the findings, that it has been guilty of unfair labor practices and the order that it desist, are wholly without support in the evidence, while the Board on its part insists that both findings and order are well supported. What is in question here then is simply and solely a question of law, whether within the meaning of Sec. 160, Title 29 U.S.C.A., and the decisions under it, the Board's findings and order are supported by substantial evidence. Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142–147, 57 S.Ct. 648, 81 L.Ed. 965. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. That is, the evidence relied on to give conclusiveness to the Board's fact findings must be "evidence which is

substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Labor Relations Board v. Columbian Co., 306 U.S. 292, 299–300, 59 S.Ct. 501, 505, 83 L.Ed. 660.[1]

■ A careful examination of the record discloses no substantial conflict in the evidence. The question for decision here, the same as that which arises in common law cases tried to a jury, is whether the undisputed evidence, with the reasonable fact inferences to be drawn therefrom, supports the verdict, that is, whether reasonable and impartial minds could, upon the evidence, have reached the conclusion the Board did.

The statute in conferring upon the Board jurisdiction both to accuse and to try, to prosecute and to decide, charges of unfair labor practices, confers these mutually antagonistic powers with full recognition of and in full subordination to, the principles, at once of natural right and of constitutional law, that no man may be a judge in his own cause and that accusation is neither proof nor evidence of guilt. To preserve these principles from corruption, the Statute, while giving wide and flexible powers of inquiry and hearing to the Board, yet insures, to every person affected by its orders, that his cause will be fairly adjudged, by providing, as an essential to enforcement of an order, that there be a judicial review upon the question whether, and a determination that, the order is supported by evidence. Contrary to the expressed view of some, that the Congress in enacting this legislation, was more concerned with expedition and specialization than with preserving these fundamental principles, more concerned with getting questions decided, than with getting them justly decided, the whole structure of the act as well as the whole course of informed judicial decision under it, makes it plain that this is not so. The enforcing section of the act[2] particularly shows that the Congress was primarily concerned to insure

---

1 Cf. Baltimore & O. Ry. Co. v. Groeger, 266 U.S. 521, 45 S.Ct. 169, 69 L.Ed. 419; Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Appalachian Electric Power Co. v. National Labor Relations, 4 Cir., 93 F.2d 985, 989.

2 "The Board shall have power to petition any circuit court of appeals * * * for the enforcement of such order * * * and shall certify and file in the court a transcript of the entire record in the proceeding, including the pleadings

that the Board as accuser, must, in order to obtain enforcement of its order, secure judicial approval of its findings as trier, as supported by evidence, and thus afford the accused the due process of having the verdict of the Labor Board as trier, judicially reviewed and decided by the Circuit Courts of Appeals by the rules and standards applied to review of jury verdicts.

In this view, those misjudge the people and the Congress who, querulously complain that courts substitute their appraisal of the evidence for that of the Board, if they mean by that complaint that Congress has conferred upon the Board power not only to make conclusive findings, when in the opinion of the courts, these findings are supported by evidence, but power to conclusively determine, beyond judicial review, that these findings are so supported. Nothing in the genius of the American people and of the institutions they have founded and cherished, nothing in the history of the long struggle of English speaking peoples against the arbitrary and despotic exercise by Governments of seated power, nothing in the statute, nothing in the decisions of the courts, rightly supports this view. Nothing in the well established and clearly recognized principle, that an administrative board may constitutionally and fairly exercise both accusatorial and trial functions at all supports it.[3] On the contrary, that principle as established and applied in America refutes this view.

In its capacity as accuser, the Board, under the genius of our institutions, is held to the same burdens and obligations of proof as any other litigant who takes the affirmative. It may not by accusing put the accused upon proof. As accuser it must prove its charge.

In its capacity as a trier of facts, the Board stands on the footing of a jury. Like a jury it must be impartial. Like a

jury, it may not make findings without evidence to support them and as in the case of a jury, it is for the courts to say whether there is or is not evidence in support.

In sponsoring the charges of Oil Workers' International Union, No. 243, and issuing its complaint thereon, the Board was acting purely in its accusatorial capacity and in that capacity it, of course, had the burden of proof to establish before itself, in its capacity as trier, the accusations it had laid. In its capacity as accuser, the Board like any other "person on whom the burden of proof rests to establish the right of a controversy, must produce credible evidence from which men of unbiased minds can reasonably decide in his favor." It cannot any more than any other litigant can, "leave the right of the matter to rest in mere conjecture and expect to succeed." Samulski v. Menasha Paper Co., 147 Wis. 285, 133 N.W. 142, 145.

In its capacity as trier, the Board is held to the same high standard of impartiality and fairness that a jury is held to, and its findings just as those of a jury, "must rest on probabilities, not on bare possibilities." Samulski v. Menasha Paper Co., supra. "Verdicts cannot rest upon guess or conjecture." Shapleigh v. United Farms Co., 5 Cir., 100 F.2d 287, 289.

"The doctrine of those cases condemns the grounding of a verdict upon such shadowy proof as not to establish the vital facts to a reasonable certainty." Samulski v. Menasha Paper Co., supra. Findings of the Board just as jury findings must rest on something firmer than mere suspicion, conjecture or surmise. United States v. Crume, 5 Cir., 54 F.2d 556, 558; Austin v. Nieman, Tex.Com.App., 14 S.W.2d 794; Community Natural Gas Co. v. Henley, Tex.Com.App., 24 S.W.2d 10; Baltimore & O. Ry. Co. v. Groeger; Gunning v. Cooley, supra. "The rule as to substantiality

---

and testimony upon which such order was entered and the findings and order of the Board. * * * The findings of the Board as to the facts, if supported by evidence, shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence * * * the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the transcript. * * * The jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the * * * cir-

cuit court of appeals * * * and by the Supreme Court of the United States upon writ of certiorari or certification as provided in sections 346 and 347 of Title 28."

[3] "To be sure, the laws under which these agencies operate prescribe the fundamentals of fair play. They require that interested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion." Federal Communications Co. v. Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 442, 84 L.Ed. ——.

is not different, we think, from that to be applied in reviewing the refusal to direct a verdict at law, where the lack of substantial evidence is the test of the right to a directed verdict. In either case, substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences."[4]

When then, as here, the Board applies to this court for enforcement of its order, and there is a substantial challenge of the findings and order as unsupported by evidence, it is the duty of this court to examine the evidence for itself, not, of course, to determine what fact inferences it, acting as a trier, would have drawn, what fact findings it would have made, but to determine whether reasonable minds having no interest as accuser or otherwise in the result, but wholly impartial, could, upon the evidence, have legally and fairly drawn the fact inferences, made the fact findings. And, when, it is clear as here, that the material evidence, is entirely without dispute; that no witness denies a fact to which another testifies; that in short, the findings are based, not upon conflicting but upon non-conflicting evidence, our determination as to whether the Board's findings must stand or fall must not rest upon whether the Board deems that the inferences it drew are supported by substantial evidence. It must rest upon whether measured by the settled rules governing the review of jury verdicts, it is the opinion of this court that the undisputed facts are in law capable of fairly giving rise to the fact inferences the Board has drawn.

This must be so for if it were not, if the Board in the determination of these sometimes bitter and always partisan contests between nationally affiliated locals and those unaffiliated, were given the right at once, to sponsor as accuser the side of the national organization, and to determine conclusively, for itself, unchecked by judicial review, not only the effect of conflicting evidence but whether in law, there is any substantial evidence to sustain its accusation, it would be nothing short of a miracle if these proceedings either in their course or in their result should be found to afford due process. The American people from their beginnings have been skeptical of the occurrence of such miracles, and they have not been willing to leave the vital matter of a fair and just trial to the hazard of miraculous intervention. It is plain from the careful provisions the Congress has made in the act against the exercise of this unbridled power that it is equally skeptical of such miracles, and that it is equally unwilling to leave to such hazards the rights of self-organization which the statute guarantees to workers, free from compulsion from any source. For, while a proceeding of this kind takes the form of a charge against the employer, the real substance and design of it is, to seat one labor organization over another, with the greatly unjust result, if the decision of the labor board is wrong, of depriving employees of the very rights the act guarantees them.[5]

What the statute defines and prohibits as an unfair labor practice on the part of the employer is, (1) to interfere with, restrain or coerce employees in the exercise of their rights to self-organization, to form, join or assist labor organizations to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, and (2) to interfere with the formation or organization of any labor organization or contribute financial or other support to it.

It nowhere provides, and there is no warrant in it for the view, that preference by employees for an unaffiliated as against a nationally affiliated organization, raises a presumption that this preference

---

[4] Appalachian Electric P. Co. v. National Labor R. Board, 4 Cir., 93 F.2d 985, 989.

[5] "It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection. (July 5, 1935, c. 372, § 1, 45 Stat. 449.)" Sec. 151, Title 29 U.S.C.A.

was coerced or bought by the employer. Indeed, the statute goes on exactly the contrary presumption, that employees have the intelligence and character requisite for self-organization, either by joining an existing labor organization or forming one of their own.

■ ■ While there was considerable evidence, that which is material may be briefly stated. In 1935, the company initiated, and until 1937, when the Federation was formed, within the meaning and intent of the statute, dominated and contributed financial and other support to the formation and administration of a Plan of employee organization, thereby interfering with, restraining and coercing its employees in the exercise of the rights guaranteed in Section 7 of the act, 29 U.S.C.A. § 157. In October, 1937, a new organization was formed to be known as Employees Federation of the Magnolia Petroleum Refinery, Beaumont, Texas. The new plan was described as "providing for the election of representatives whereby employees may bargain collectively within the company without outside influence or dues." In November, 1937, the affiliated local 243, which filed the charges on which the present proceeding is based, filed charges with the Regional Director that the respondent had dominated, fostered, encouraged, sponsored and interfered with the administration of both the Plan and the Federation. In December, 1937, the Regional Director advised the respondent that "full freedom of choice in selecting a collective bargaining agency could not be had without disestablishment of the Federation, but that if the respondent would post a notice announcing that it was withdrawing all recognition from, and completely disestablishing its relations with the Federation, it might be considered as having complied with the Act." On March 25, 1938, Cruse, chairman, and Hodges, secretary of the Federation, consulted with the Regional Director in Fort Worth, concerning its status and as a result of that conference,[6] at a meeting held two days later, the Federation Counsel voted to disband the organization and to notify the Regional Director and respondent of its disbandment by telegram. On March 29, 1938, the respondent posted a notice to its employees prepared by the Board's representative.[7]

[6] Hodges testified, and there is no contradiction of his testimony, that Dr. Elliott, the Regional Director of the Board to whom he went for aid and guidance in regard to forming an organization that would satisfy the Board, told him: "Well, he told us that the Federation, I believe he used the word, stinks; it is company dominated from the word go, and I asked him how he arrived at these conclusions and he said he had sent investigators down here. I then asked him if the investigators had investigated both sides of the question, or just one, he then raised up over the table and shook his finger in my face, and told me that his integrity could not be questioned. I begged his pardon and told him I had not intended to question his integrity; that I was merely trying to find out if that was the case. I asked him about disbanding the federation, what would happen; and he said: 'I will tell you right now you can't disband the Federation and go out the back door and comb your hair, and come back in almost as quick as you go out. If you do, we are going to prefer charges against you.' I said, 'Dr. Elliott, will you prefer charges against us?' and he smiled and he said No, but I am sure the C. I. O. will.' That is when he told me we could not organize again in that way."

[7] "Notice To All Employees of The Magnolia Petroleum Company Refinery At Beaumont, Texas.

"It is agreed by the Magnolia Petroleum Company that:

"1. It will not encourage or support or cause to be encouraged or supported the continued existence or activities of the Employees Federation of the Magnolia Petroleum Company, and that it will prohibit said Federation and its members from soliciting members or collecting dues or holding elections or otherwise engaging in activities on behalf of sad Federation on the refinery property at any time; that said Federation will no longer be permitted to use the space above the company cafeteria for its meetings.

"2. That the company will not in any manner interfere with, restrain or coerce its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

"3. That it will not dominate or interfere in any manner with the formation and administration of any labor organ-

On April 6, the Regional Director wrote to the Company: Gentlemen: "This is to advise you that in view of recent adjustments of the dispute involving your Beaumont Refineries, further proceedings in the above case are not contemplated by this office. May we take this opportunity to thank you for your cooperation with this office." In connection with the posting of the notice, Mr. Newton, vice-president and general manager of the Refinery, testified, and there was no testimony in contradiction, that he had had conferences with assistant managers, superintendents and assistant superintendents of the Beaumont plant and had instructed them that the notice was going to be posted; that it was to be understood that there was to be no interference with the employees or any action which could be taken to be coercion, sponsorship or favoritism; that those instructions were given in good faith; and that they had in good faith been carried out.

On April 7, the Independent was formed by about 80 employees, meeting in a Beaumont Hotel. Two days later a committee of the group met to select men to go to Fort Worth, to confer with the Regional Director concerning "what kind of an organization would stand up." On April 12th, the men selected conferred with the Regional Director.[8] During the ensuing weeks the Independent carried on a successful organizing campaign, rented quarters, retained an attorney and adopted a constitution. No one testified that the management had taken any action in regard to the Independent, its formation, its membership campaign or its conduct.

The Board based its conclusion of domination, interference or support upon evidence now to be referred to and upon this alone. The first piece of evidence is that one Smith, a supervisor of stenography and comptometry in the respondent's offices and one of the employees authorized by the act to form their own union or to join another, had been active in the Federation, had presided over the April 7 meeting of the Independent, had participated in the meeting at which employees were selected to consult with the Regional Director, and had told the men who made the trip, to seek the advice in Dallas of one Russell Surles whom Smith knew to be an attorney retained by respondent. But, in connection with this evidence and as showing that even if Smith was trying to act for the company, his act had no effect, the Board found that the two men thus advised, when they found out that Surles was attorney for the company, declined to discuss their business with him. The second piece of evidence on which the Board relies is that one E. L. Barton, a kind of straw boss

ization of its employees or contribute financial or other support thereto.

"4. That it will not discourage a membership of its employees in the Oil Workers International Union, Local 243, or any other labor organization by discrimination in regard to hire or tenure of employment or any terms or conditions of employment.

"5. That the company will not contribute support of any kind or participate in and will withdraw all recognition from and will completely disestablish its relations with the existing Employees Federation at its refinery in Beaumont, Texas, and any representative elected thereunder as representative of any of its employees for the purpose of dealing with it concerning grievances, labor disputes and working conditions.

"6. The company hereby instructs its foremen to avoid any expression of favoritism toward any labor organization and to remain neutral in all questions pertaining to labor organizations.

"7. Under the National Labor Relations Act all employees have the right to join, form or assist a labor organization of their own choosing, and in the exercise of this right the company assures them that it will be free from any interference or discrimination.

"8. This notice shall remain posted on bulletin boards in conspicuous places at the company's refinery in Beaumont for a period of 30 days from the date of posting. The places selected for posting shall be such that all refinery employees will have an opportunity to observe this notice.

"J. S. Newton
"Vice-President and Manager
of Refineries."

[8] "Q. Did he tell you that you could set up such an organization here? A. He didn't say I could do it. He said it could be done. He told me that my particular group that I was representing, if they went ahead and formed that group, that they had two strikes against them before they started.

"Q. Did anything else occur in there after that? A. Dr. Elliott and me had a confidential talk after the questions was answered and put away.

"Q. Did he state that that was to be confidential? A. I termed it as such."

or sub-foreman over a dozen colored laborers, but one of the employees to whom the act guarantees the right of self-organization, had been active in the prior organization, and was elected temporary president of the Independent. Thus, by its finding, the Board denies to Barton the very right the statute gives him, of action with his fellow employees for self-organization.

A third piece of evidence is, of the same kind, that Morris and Burge, two men active in the formation of the Independent, had been representatives under the Federation. A fourth piece is, that Wheat, a supervisory employee, must have his actions in participating in the efforts to form the organization, a right the statute guaranteed to him, attributed to respondent. While, the fifth piece is that Hodges and Cruse, officers of the Federation, had telephoned to one Hensly, assistant in the Industrial Relations Department, and had charged the call to Hensly. Notwithstanding that both of these men testified that they called Hensly to tell him about their conversation with Elliott and for the purpose of finding out about an unaffiliated labor organization which was operating satisfactorily at some other company plant, and that there was no proof whatever contradicting them, the Board on suspicion alone finds that this shows that the company dominated, interfered with and contributed to the support of the new organization.

Petitioner insists that this evidence forms no basis whatever for the inferences the Board drew from it, that the company dominated, interfered with or contributed to the support of the Independent and that it does not at all justify the Board in condemning both the men who formed the Independent and the company as covinously and secretly conspiring together to violate the law. We agree.

Absolutely all that the evidence shows as to the Independent is that it was formed by employees struggling singlehanded and alone, to exercise the rights of self-organization the Congress has guaranteed them against the efforts of the affiliated local, sponsored and supported by the Board, to compel them to join or be represented by it. The evidence shows that without, as the affiliated local has, a national organization to assist them and obliged to do the best they could on their own, they made an earnest and in the light of the result, a pitiful effort to enjoy these rights. Harassed and prevented at every turn, by persistent attacks upon them, made by the local and sponsored by the Board by means of complaints and charges, that their employer had coerced or bought them into forming and joining the union they seek to form, the employees in the Independent are by the findings and order complained of, presented the Hobsons' choice of joining the affiliated local or going without self-organization, and this upon a record wholly devoid of evidence at all supporting the charges.

In the argument before the court in answer to a question from the Bench, whether it was the Board's contention that men who had ever been connected with a union, which in the opinion of the Board was company dominated or supported, were thereby forever debarred from assisting to form another organization, counsel for the Board said "No, but the Board feels that there should be a breathing space between the dissolution of one organization and the formation of another."

We find no support in the authorities nor in the act for such a view. Indeed in National Labor Relations Board v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867, 870, the contrary of that was decided. We there said, "The act does not compel employees to affiliate themselves * * * nor does it prevent them from forming truly independent local associations of their own." And further, after saying that the Association should be completely disestablished as representative of the employer, we said, "this does not mean of course * * * that the employees may not immediately, provided it is with complete independence and freedom from the domination, interference or support of the management, form their own union. It certainly does not mean that they must join the organization of complainant."

We think it plain that the findings in this case are based on nothing but suspicion, surmise and conjecture; that they are wholly unsupported by the evidence and that they and the order based on them cannot stand.

The petitioner's prayer that they be set aside is granted; the Board's prayer for enforcement is denied.