539 F.2d 705
 92 L.R.R.M. (BNA) 3652, 79 Lab.Cas. P 11,553
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
G & P Trucking Co., Inc., Petitioner
v.
National Labor Relations Board, Respondent.
 No. 75-1307.
 United States Court of Appeals, Fourth Circuit.
 Aug. 11, 1976.
 
 1
 Before BOREMAN, Senior Circuit Judge, WIDENER, Circuit Judge, WATKINS, District Judge.*
 
 
 2
 BOREMAN, S.C.J.
 
 
 3
 The petitioner seeks review of an order of the NLRB enforcing a finding by an administrative law judge that the discharge of two of the petitioner's employees, James Dunn and Fleming Adair, violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act.[1] The Board has cross-petitioned for enforcement of its order.
 
 
 4
 The evidence presented before the administrative law judge indicated that the petitioner (G & P) is an intrastate trucking company doing business in South Carolina. G & P has a terminal located in Greenville, South Carolina, and a substantial portion of its business consists of hauling goods between various factories in South Carolina and the Greenville terminal facilities of Pilot Freight Lines (Pilot), an interstate trucking company. Prior to the discharge of the two employees in March 1974 G & P's employees were not represented by a union. However, on January 25, 1974, three employees, including Adair, visited a Teamsters Union office where they signed union authorization cards. The union subsequently notified G & P by telegram that Adair and two other employees were in the process of trying to organize a union. As a result of the efforts of these three employees in soliciting signatures on authorization cards, the union notified G & P on January 28, 1974, that thirty additional employees, of approximately thirty-eight employed at the Greenville terminal, had joined the organizing committee. The evidence further indicated that on January 31, 1974, G & P's president, Byrd, addressed a meeting of the supervisors at the Greenville terminal indicating his desire not to have a union and stated that the best way to keep the union out was to get rid of the "troublemakers" whom he identified as the three employees mentioned in the union's telegram of January 25. Testimony presented at the hearing before the administrative law judge indicated that Byrd repeated these remarks in a private conversation on February 20.
 
 
 5
 On March 4, 1974, the Teamsters Union, which also represents employees of Pilot Freight Lines, went on strike against Pilot in support of contract demands and pickets began to patrol Pilot's Greenville terminal. On the afternoon of March 4 Dunn, one of the employees identified as a union supporter in the letter of January 28, was scheduled to deliver freight to Pilot's terminal. When Dunn reached Pilot's terminal he observed the pickets, did not enter, and returned to the petitioner's terminal where he reported the situation to his dispatcher, Cehan. Cehan replied that Pilot's employees were not on strike but, upon Dunn's insistence that they were, directed Dunn to back his truck to the loading dock where the freight destined for Pilot was unloaded. Dunn was never reprimanded or disciplined for this incident.
 
 
 6
 A similar incident occurred on March 6 when another driver, listed as a union supporter in the January 28 letter, refused to cross the picket line at the Pilot terminal, stating that he was afraid to cross. G & P's terminal manager, Davis, then delivered this freight to Pilot and upon returning told the driver that there was no violence and that he was expected to make further scheduled deliveries to Pilot. The driver then agreed to do so.
 
 
 7
 On March 7 Adair was dispatched to deliver freight to several terminals, including Pilot. Shortly before reaching the Pilot premises Adair called his dispatcher, Cehan, and asked about the picket line at Pilot. Cehan replied that another driver as well as the terminal manager had crossed the picket line without incident. As he approached the Pilot terminal Adair observed two pickets with signs, did not enter the Pilot premises, and returned with the undelivered freight to his own terminal. He was again assured by Cehan that other drivers had crossed the picket line without incident but Adair replied "that doesn't mean that I won't get hurt," and stated that he would not cross the Pilot picket line. Shortly thereafter Cehan informed Adair that G & P's terminal manager, Davis, had instructed him to require Adair to deliver the freight to Pilot and stated that if Adair refused he should "clock out." Adair "clocked out," but returned to the G & P terminal the next day and was told by Davis that, since he had refused to perform an assigned duty, the company had "nothing further for him." Adair was then paid the salary due him plus vacation pay and safety bonus.
 
 
 8
 After refusing to cross the picket line on March 4 Dunn was again assigned to make a delivery to the Pilot terminal on March 14. Upon receiving this assignment Dunn stated to Cehan that he could not perform it because "a man could get killed crossing a picket line." Dunn repeated this to a second employee and to Davis. Dunn was then informed that the Company had "no further business" for him and the next day Dunn was paid his back salary and bonuses.
 
 
 9
 The evidence indicated that the only reason given initially by both Dunn and Adair for refusing to cross the Pilot picket line was fear for their personal safety. Furthermore Adair testified two months later in a hearing before the South Carolina Employment Security Commission that his reason for refusing to cross the picket line was fear for his personal safety. There is no evidence that any drivers who crossed the picket line encountered any trouble and there was no evidence that, after March 6, any of G & P's drivers other than Dunn and Adair refused to cross the picket line at Pilot. It was not until the hearing before the administrative law judge that Dunn and Adair stated that their refusal to cross the picket line was based upon sympathy with the striking Pilot employees.
 
 
 10
 The Board adopted the administrative law judge's findings and order holding that G & P's action in discharging Dunn and Adair violated Secs. 8(a)(1) and 8(a)(3) of the National Labor Relations Act. We hold that the portion of the order finding a violation of Sec. 8(a)(1) may not be enforced because the discharge of the two employees did not, as a matter of law, violate Sec. 8(a)(1). Also, the portion of the order finding the petitioner in violation of Sec. 8(a)(3) will not be enforced because there was not substantial evidence of a violation of Sec. 8(a)(3), and we remand the case to the Board to permit the introduction of further evidence regarding the alleged Sec. 8(a)(3) violation.
 
 
 11
 * At the outset, G & P contends that Dunn and Adair were not actually discharged but only temporarily suspended for the duration of the Pilot strike. The fact of discharge does not depend upon the use of formal words of discharge; it is sufficient if the words or conduct of the employer "would logically lead an employee to believe his tenure had been terminated...." NLRB v. Cement Masons Local No. 555, 225 F.2d 168, 172 (9 Cir.1955); accord, Filler Products, Inc. v. NLRB, 376 F.2d 369 (4 Cir.1967); NLRB v. Comfort, Inc., 365 F.2d 867 (8 Cir.1966); NLRB v. Trumbull Asphalt Co. of Delaware, 327 F.2d 841 (8 Cir.1964). In the instant case the two employees were not only told that the company had "nothing further" for them but also were paid all their accrued pay and bonuses. We conclude that these acts, in the absence of any statements by the employer that the employees could later return, could logically lead them to believe that they were permanently discharged. We find no merit in G & P's contention that the employees were merely suspended.
 
 II
 
 12
 Section 8(a)(1) of the National Labor Relations Act establishes that it is an unfair labor practice for an employer to abridge rights guaranteed by section 7, which provides that employees are given "the right to self organization, to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. Sec. 157. As applied to an employee who refuses to cross a picket line, it is well established that section 7 may provide protection to non-striking employees who refuse to cross a lawful picket line maintained by striking employees of a common employer even though the striking union is not the bargaining representative of the nonstriking employees. NLRB v. Union Carbide, 440 F.2d 54 (4 Cir.), cert. denied, 404 U.S. 826 (1971). Although it has been said that nonstriking employees who refuse to cross a picket line maintained against a third party employer are also protected by section 7,[2] this court has never approved or adopted such a rule. Virginia Stage Lines, Inc. v. NLRB, 441 F.2d 499 (4 Cir.), cert. denied, 404 U.S. 856 (1971). The Board argues that we should adopt an absolute rule recognizing section 7 protection in either situation; however, we hold that section 7 protects employees only where their refusal to cross a picket line is concerted activity in furtherance of collective bargaining or other mutual aid or protection.[3]
 
 
 13
 In Union Carbide, this court recognized that the protection provided by section 7 is not unlimited. There we held that the refusal of a nonstriking employee to cross a picket line at his own employer's place of business because of fear of physical harm is not activity protected by section 7 because
 
 
 14
 One who refuses to cross a picket line by reason of physical fear does not act on principle. He makes no common cause, and contributes nothing to mutual aid or protection in the collective bargaining process.
 
 
 15
 440 F.2d at 56. The only reason initially given by Dunn and Adair for their refusal to perform their assigned tasks was that of physical fear. If Dunn and Adair had maintained their original reasons at the hearing, it is clear that neither would be entitled to the protection of section 7. However, in testifying before the administrative law judge, both employees indicated that their refusal was based on union sympathy. Thus, a fundamental issue to be resolved in this case is whether an employee's protection under section 7 is controlled by statements made to his employer at the time of his refusal to work, or by the reasons he subsequently articulates to the Board. We conclude that the rule stated in Union Carbide requires that the employer be permitted to rely and act upon the reasons given by his employee for refusing to perform his work assignments; otherwise the discharged employee could gain section 7 protection merely by changing his story at a later date. When an employee is discharged for refusing to work, it is the function of the administrative law judge to determine what reasons were given to the employer at the time of the employee's refusal, and whether those reasons indicated that the employee, by refusing to work, was participating in protected activity. Evidence of subsequent statements by the parties is relevant only when introduced for impeachment purposes, or where exceptional circumstances exist which require that the employer be charged with constructive knowledge of the falseness of the original statements. The latter may occur where there is evidence of unlawful coercion by the employer to induce the employee to make statements which the employer should reasonably expect to be false.[4] Our review of the record reveals no evidence that the employees were coerced into giving any statements at the time of their refusal to work; nor is there any evidence that G & P was notified, prior to discharging the employees, that the dischargee's refusal to perform work assignments was based on anything other than physical fear.
 
 
 16
 The Board contends that this court has held in Virginia Stage Lines, supra, that the Board may consider factors other than the employee's stated reasons for refusing to cross the picket line, and that an employee's participation in union activities may be sufficient to imply collective bargaining motives in refusing to work. We do not think Virginia Stage Lines states so broad a rule. In Virginia Stage Lines this court found that the close operating relationship of two bus lines required that the companies be considered a common employer. Furthermore, Virginia Stage Lines involved the refusal of Virginia Stage employees to perform assignments which would normally have been performed by the striking drivers. By requiring its drivers to perform such duties the company would place its employees in a position where they benefitted a common employer and weakened the collective bargaining efforts of the striking workers. This court there recognized that when an employer uses nonstriking employees to influence the collective bargaining process he will be required to determine the undisclosed motives of employees who refuse to assist him. The present dispute is clearly distinguishable from Virginia Stage Lines. In the instant case there has been no showing that the relationship between G & P and Pilot Freight Lines was such as to permit the discharged employees to claim protection under the common employer rule. Also, the assignments refused by Dunn and Adair were normally performed by G & P employees regardless of whether Pilot's workers were on strike, and neither employee was assigned duties which would directly affect the operation of the collective bargaining process. The standard applied by this court under the facts as they existed in Virginia Stage Lines clearly has no logical applicability in the instant case.
 
 
 17
 In reviewing the record, we find uncontroverted evidence indicating that the only stated reason given for disobedience by either employee at the time of discharge was that of physical fear. The same reason was later reiterated by Adair before the South Carolina Employment Security Commission. We hold that under the present circumstances the employees' motives should be determined by evidence of their statements at the time of discharge. Consequently, we conclude that the Board's finding that the employees were engaged in protected activity is not supported by substantial evidence. Where, as here, there is no infringement upon protected activity there can be no violation of section 8(a)(1) and enforcement of that portion of the Board's order should be denied.
 
 III
 
 18
 Since the discharged employees' refusal to cross the Pilot picket line was not protected union activity, a discharge for that reason alone is not discrimination which violates section 8(a)(3). However, our determination that the refusal to cross a picket line is not protected activity under the present circumstances does not preclude the Board from considering whether there was an independent basis for finding a violation of section 8(a)(3).
 
 
 19
 Generally, an employer may dismiss an employee "for good cause, no cause, or for any reason except the employee's union activity." Torrington Co. v. NLRB, 506 F.2d 1042, 1047 (4 Cir.1974). However, the employer may not discharge active prounion employees for nondiscriminatory reasons if a desire to stifle protected activity is a factor in the employer's decision; a discharge under such circumstances would be discriminatory and in violation of section 8(a)(3). Winchester Spinning Corp. v. NLRB, 402 F.2d 299 (4 Cir.1968). Thus, while a discharge for engaging in unprotected activity is not in itself a violation of either section 8(a)(1) or section 8(a)(3), it may be a violation of section 8(a)(3) if there is substantial evidence showing that antiunion motives were a factor in the discharge.
 
 
 20
 In order to find a violation of section 8(a)(3), this court has consistently held that the Board, "after discounting all explanations offered by an employer for discharge of employees, must find unlawful motivation through substantial direct or indirect evidence." Riggs Distler & Co. v. NLRB, 327 F.2d 575, 580 (4 Cir.1963) (emphasis added). Substantial evidence has been defined as "evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences." Appalachian Electric Power Co. v. NLRB, 93 F.2d 985, 989 (4 Cir.1938); see also, Torrington Co. v. NLRB, supra; Dubin-Haskell Lining Corp. v. NLRB, 375 F.2d 568 (4 Cir.1967); Riggs Distler & Co. v. NLRB, supra. It is not the function of the court of appeals to pass upon the credibility of witnesses, NLRB v. School-Timer Frocks, Inc., 224 F.2d 336 (4 Cir.1955), and conflicts in testimony, or inferences to be drawn therefrom must be resolved by the Board. Torrington Co. v. NLRB, supra. Under proper circumstances, if there is substantial evidence of antiunion animus, it is within the Board's prerogative to reject the employer's business explanation for discharging an employee, Winchester Spinning Co., supra; even the sworn and unimpeached testimony of an employer as to the reason for the discharge need not be accepted by the trier of fact and may be disregarded in whole or in part if it is incredible, Riggs Distler & Co. v. NLRB, supra. However, the Board's discretion must be exercised reasonably, as it is equally well established that where material, uncontradicted evidence has been ignored or where evidence has been disregarded and eliminated by the casual expedient of discrediting an employer's witnesses, the administrative law judge's report and the Board's findings will not be accorded their usual weight. NLRB v. United Brass Works, Inc., 287 F.2d 689 (4 Cir.1961).
 
 
 21
 It is the duty of an appellate court, in reviewing Board decisions, to look to the record as a whole in determining whether there is substantial evidence to support the Board's findings. Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951); Riggs Distler & Co. v. NLRB, supra. In reviewing the record in this case, we note that the employees did not introduce direct evidence of discrimination, but did introduce uncontradicted evidence which indicated both that antiunion statements were made by a company official several weeks before the discharges and that company officials knew of the employees' union sympathies. G & P countered the employees' evidence of antiunion animus by contending that its sole reason for discharging Dunn and Adair was that it was following an established company policy of discharging all employees who refused to work. G & P claimed that this policy was supported by substantial business justification because the refusal of a driver, who would normally be assigned to make deliveries to several locations on a single trip, to perform one of those deliveries would seriously disrupt G & P's operations. G & P then proffered testimony of its terminal manager, Davis, which it contended would show (1) the effect on the normal operation of the terminal when a driver refused to make a delivery, (2) the inconvenience, confusion and disruption which would be caused on the loading dock when a driver refused to make a delivery, (3) the additional equipment and drivers which would become tied up as a result of one driver's refusal to deliver goods, and (4) how, as a result of the refusal of a driver to work, freight would be delayed in its shipment. Ruling upon G & P's proffer, the administrative law judge stated that he would not "receive" this evidence, and indicated that his consideration of evidence of business justification for the discharges would be limited to that which showed the effects on G & P's business resulting from the two occasions on which the discharged employees refused to work.
 
 
 22
 Although the administrative law judge can reject the employer's explanation for discharges when there is substantial evidence of antiunion animus, Winchester Spinning Corp. v. NLRB, supra, he is not entitled to reject, without consideration, relevant evidence proffered by the employer in support of its explanation. In this case, G & P sought to explain the discharges as resulting from its adherence to a "company policy" which was justified by and based upon sound business reasons. The administrative law judge did not specifically address the validity of this "company policy" in his findings but found, instead, that section 8(a)(3) was violated because G & P failed to show business justification for the discharges.[5] This finding was made despite the fact that G & P was denied an opportunity to present evidence of business justification; evidence which it represented would not only demonstrate a business justification for adhering to its established policy but also serve to rebut any inference of discriminatory motivation for the discharges. Because the excluded evidence was offered to justify the business necessity of G & P's asserted "company policy," we conclude that it was relevant and should have been considered in determining whether there was a business purpose underlying the discharges. Exclusion of this evidence was an unreasonable exercise of discretion.
 
 
 23
 Having refused to receive and consider relevant evidence proffered by G & P in support of its position that its actions were based upon justifiable business purposes, the administrative law judge could not properly support, by "substantial evidence," a finding that the employees here involved were not discharged for justifiable business purposes.
 
 
 24
 Accordingly, enforcement of the portion of the Board's order holding G & P in violation of section 8(a)(1) is denied. The case will be remanded to the Board for further proceedings and reconsideration of the alleged section 8(a)(3) violation. On remand, the proceedings should be conducted in a manner consistent with this opinion.
 
 
 
 *
 United States District Judge for the District of Maryland sitting by designation
 
 
 [1]
 Section 8(a) of the Act is codified as 29 U.S.C. Sec. 158(a), which provides in applicable part:
 It shall be an unfair labor practice for an employer--
 (1) to interefere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7; ... [or]
 (3) by discrimination in regard to hire or tenure of employment to encourage or discourage membership in any labor organization ...
 
 
 [2]
 It is not clearly established under what circumstances, if any, an employee who refuses to cross a picket line is entitled to section 7 protection; nor is it clear under what circumstances the denial of a section 7 right will result in a violation of Sec. 8(a)(1). Some courts which have been concerned with cases involving discharges of employees who refuse to cross "stranger" picket lines have adopted, without qualification, the conclusion of the Second Circuit in NLRB v. Rockaway News Supply Co., 197 F.2d 111 (2 Cir.1952), aff'd on other grounds, 345 U.S. 71 (1953), that "the refusal of an employee to cross a picket line of another union than his own at another plant than that of his employer is an exercise of [rights] ... expressly guaranteed by Section 7 of the Act." 197 F.2d at 113; see NLRB v. Alamo Express, Inc., 430 F.2d 1032 (5 Cir.1970); Teamsters Local Union No. 79 v. NLRB, 325 F.2d 1011 (D.C.Cir.1963). However, it is disputed as to whether the Second Circuit intended to apply such an unqualified rule since it nevertheless found that the discharge of an employee did not violate section 8(a)(1) because an employee "is not free to exercise his right during his working time in violation of his employer's working rules by refusing to perform that part of his regular duties which requires him to cross the picket line." 197 F.2d at 113. On the other hand, other courts which have considered similar factual stiatuions have declined to decide whether the refusal to cross a "stranger" picket line was protected activity. NLRB v. Swain and Morris Const. Co., 431 F.2d 861 (9 Cir.1970): NLRB v. L.G. Everist, Inc., 334 F.2d 312 (8 Cir.1964). In Everist, the Eighth Circuit expressly declined to decide the question of section 7 protection, stating that, regardless of section 7 protection, the refusal of drivers to cross a picket line could not violate section 8(a)(1) where "[s]uch refusal was no more and no less than a refusal to work, a violation of their contract to continue hauling for which they could be and were validly discharged." 334 F.2d 317. We express no opinion on this issue
 
 
 [3]
 This rule has been consistently applied by this court in determining activity protected by section 7. See Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749 (4 Cir.1949). An identical rule was followed by this court in Union Carbide, supra, to determine whether an employee who refused to cross a picket line at his employer's place of business was protected by section 7
 
 
 [4]
 It is well established that when an employee is interrogated about this union sympathies, his untruthful statements denying union sympathies may be evidence of unlawful coercion. Corrie Corp. of Charleston v. NLRB, 375 F.2d 149 (4 Cir.1967). It does not follow, however, that false statements volunteered by an employee, in the absence of any evidence of coercion, are substantial evidence of unlawful coercion, for which the employer should be penalized
 
 
 [5]
 In concluding his findings, the administrative law judge stated:
 [H]aving heretofore found that Respondent did not discharge Adair and Dunn for justifiable business purposes, I find and conclude that by such discharges Respondent violated ... Section 8(a)(3)."