**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**GLASS MARINE INDUSTRIES, INC., a Delaware corporation, Defendant.**

**Civ. A. No. 2276.**

United States District Court
D. Delaware.

July 23, 1962.

On Plaintiff's Motion for a New Trial
Aug. 31, 1962.

See also 199 F.Supp. 18.

The Securities and Exchange Commission charges Glass Marine Industries, Inc., defendant, and Hayden Leason, Intervenor, pro se, with violations of Sections 17(a) (1), 17(a) (3) and 24 of the Securities Act of 1933 (15 U.S.C.A. §§ 77q(a) (1), 77q(a) (3) and 77x) and Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78j (b)) and Rule 10b-5 (17 C.F.R. 240.-10b-5) and plaintiff, pursuant to Section 20(b) of the Securities Act of 1933 (15 U.S.C.A. § 77t(b)) and Section 21(e) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78u(e)), brings this action to enjoin such acts and practices. This action arises under Section 22(a) of the Securities Act of 1933 (15 U.S.C.A. § 77v(a)) and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78aa). The suit is in connection with the public offering on July 6, 1960, of the defendant's securities. The violations charged against both defendants are essentially the same. The gravamen of plaintiff's case is that the Company and the Intervenor did not plan to operate a boat business as represented in the Prospectus; that they had other plans which were omitted from the Prospectus by fraudulent design. Specific charges of violation include accusations against the Company and Intervenor that:

(1) the Company and Intervenor never intended to manufacture outboard motor boats as represented in the Prospectus and its activity in this respect was insubstantial;

(2) the Company and the Intervenor never intended to manufacture the "Hydrojet" pleasure craft as represented in the Prospectus and its efforts in this respect were insubstantial;

(3) the Company and Intervenor never intended to build a plant in Humboldt, Iowa, as represented in the Prospectus;

(4) the Company and Intervenor never intended to engage in the boat business generally as represented in the Prospectus and its efforts in this respect were insubstantial;

(5) the Company and Intervenor intended to use the proceeds of the public offering of its securities for purposes not disclosed in the Prospectus, such failure to disclose being pursuant to fraudulent design;

(6) the Company and Intervenor prior to the effective date of its Prospectus (July 6, 1960) intended the Company to merge with Amphibious Boats, Inc. (hereinafter referred to as "Amphibious") or Browne Window Manufacturing Co. (hereinafter referred to as "Browne Window") and with fraudulent intent failed to disclose such plans in its Prospectus; and

(7) the Company and Intervenor prior to the effective date of its Prospectus (July 6, 1960) intended to make loans to Amphibious and Browne Window and with fraudulent intent failed to disclose such plans in its Prospectus.

Thomas B. Hart, John J. Enright and John W. Vogel, Chicago, Ill., for Securities and Exchange Commission.

James H. Conaway, Jr. (Morford, Young & Conaway), Wilmington, Del., and Lawrence A. Coles, Jr. (Thompson, Raymond, Mayer, Jenner & Bloomstein), Chicago, Ill., for defendant.

Hayden Leason, intervenor, pro se.

Arthur J. Sullivan (Morris, James, Hitchens & Williams), Wilmington, Del., and Saul S. Nevins, New York City, for special intervenor, Lancer Industries, Inc.

---

1. In Speed v. Transamerica Corp., D.C. Del., 99 F.Supp. 808, defendant corporation was charged with planning to merge, dissolve, or liquidate a smaller corporation in which it held substantial stock at the time it mailed out a letter to stockholders expressing no such desire.

2. Ibid. at p. 821.

LEAHY, Senior District Judge.

## I. *Preliminary Matters*

1. Judicial determination of these charges must rest on determination of intentions of Glass Marine and Hayden Leason which, at best, can only be proved by inference, by acts more convincingly consistent with a fraudulent scheme than a nonfraudulent plan. The basic question in the present cause is whether a pre-existing intent not to go into the boat business existed at the time the Prospectus was issued. Some years ago, in a somewhat similar situation,[1] I stated that:

> "Such inference—that there was such a [fraudulent] plan—must be based on the state of mind of * * * the * * * directors. To ascertain the state of mind of any witness in the case at bar at a particular point in time, I think it plain one must consider facts for a period, for example, both prior and subsequent to * * * (the date of an allegedly misleading stockholder letter). Behavior rather than words among men and women is most significant in determining intent. Attorney General v. Drummond, 1 Drury & Warren 353, 368 (Lord Chancellor Sugden, 'Tell me what you have done under such a deed, and I will tell you what that deed means'.) Although the parties are in dispute, I accept the thesis plaintiffs must show there was a pre-existing intent to liquidate, etc. at the time of the * * * letter by a preponderance of the probabilities." [2]

The bulk of the evidence introduced by the SEC is deposition-evidence.[3] Few

---

3. Judicial problems with respect to weighing deposition-evidence against witness-evidence have been aptly phrased by George P. Dike, who wrote:

"The facts elicited during depositions on discovery are brought out by two-edged questions propounded by a hostile attorney, while the witness has little defense against innuendo and misconstruction of his answers. True, the de-

persons, and none crucial to the cause, appeared and testified personally in court.[4] This is unfortunate.[5] For conflicting testimony abounds through the weighty depositions in this cause. Keenan Hanley, for example, is the inventor of the Hydrojet system of water propulsion, a director of the Company until the last annual meeting, and has a personal financial interest in the financial affairs of Glass Marine.[6] Hanley and Hayden Leason are on poor terms.[7] Hanley testified that on June 6, 1960, months after the Registration was filed and one month before the public offering became final, Hayden Leason stated at a meeting of Glass Marine's board of directors: "Well, if its going to cost this much (to make the boats) we might as well not go into it, in business with us, we are not going to make any profit on this thing. We might as well go right in and buy bonds with it or trade in the stock or something else." [8] If truly made, this may be a striking rejoinder to Leason's claim he honestly intended to go into the boat business. Nicholas Savaiano, however, former president of Glass Marine, has also testified with respect to the meeting and recalled no such conversation.[9] Leason himself denies the conversation.[10]

The decision as to whether the conversation took place or not is for the fact-finder, the trier of the case. But in a case so replete with deposition-evidence of the most crucial import, and so lacking in personal appearances before the Court of parties to the alleged comment of Leason, the fact-finding process is sty-

fendant's attorney can also question the witness, but he is better advised if he reserves his questions until the trial, but even then he is in constant danger of contradiction. The facts which have been elicited on deposition for discovery reach the court colored by the attitude of the examining attorney, and without the judge's ever having seen the witness. The whole result is a lopsided presentation of the facts—part being presented by the straightforward testimony of witnesses under the observation and control of the judge, and the rest from behind the veil of typescript." Dike, "A Step Backward in the Federal Courts: Are We Returning to Trial by Deposition?", 37 A.B.A.J. 17, 18 (1951).

4. Approximately 4700 pages of testimony was taken from 29 witnesses in the trial of this case. Five of these testified in Court; 2 of the 5 are employees of plaintiff (Mr. Mayer and Mr. Kaufman); 2 are members of the "Stockholders Committee" which sponsored the present Board (Mr. Pondy and Mr. Steiglitz); 1 is a former director of the Company (Mr. Moore). The absence of other witnesses hostile to the SEC (as Hayden Leason) is understandable, if judicially regrettable; the absence of witnesses vital to the SEC's·cause (as Keenan Hanley and R. G. Skinner) is judicially permissible, but severely limiting.

5. For recent views of this Court with respect to similar limitations on affidavits as fact-finding tools, see Stern & Co. v. State Loan and Finance Corporation, D.C.Del., 205 F.Supp. 702; cf. Dauphin Corporation v. Sentinel Alarm Corporation, D.C.Del., 206 F.Supp. 432.

6. Hanley is a promoter, director and principal stockholder of Hydrojet Marine Corporation and would have been financially benefited had Leason and Glass Marine proceeded with the plans as stated in the Prospectus to build Hydroject boats.

7. As stated, Hanley did not testify and the Court was thus unable to make a personal independent judgment of either this witness or his deposition statements. The state of Hanley-Leason relations may be observed by noting Leason's description of Hanley, as follows: "Hanley, throughout the taking of his deposition was very uncooperative, uncommunicative, hostile, erradic, and unreliable with regard to dates and memory or specific events. * * * If one were present to observe the demeanor of Mr. Hanley at the taking of his deposition, the nicest thing thaat could be said about Hanley is that he was a very unrealible, malicious, illogical and forgetfull witness." [sic] Leason Brief, p. 9.

8. Hanley, Tr. pp. 97, 98.*
* "Tr." as used herein refers to the Transcript of the deposition of named individuals.

9. Savaiano, Tr. pp. 167–173.

10. Leason Brief, p. 13.

mied.[11] Here, as too often throughout this case, no reasonable inference may be drawn as to whether this conversation did in fact take place. Decisions can, must, and will be made as to whom to believe, but with far less assistance to the decision-making process than had witnesses appeared in Court to be seen, heard, and personally evaluated.

2. A second preliminary problem should be noted. In an earlier opinion in this cause well over a year ago the Court overruled defendant's objections to admission of various investigatory transcripts. At that time, however, the Court noted its aversion to the "dump truck" method of trial practice adopted by plaintiff, and stated:

"If in [plaintiff's] main brief it makes reference to or an attempt to utilize any of the investigatory testimony or the ex parte writings in support of its allegations in its complaint, such portions so utilized must be supported by an admissibility argument." [12]

At various points in plaintiff's brief, investigatory testimony of certain of the parties is relied upon.[13] Such testimony has been examined and evaluated, but no attempt will be made here to rule on the admissiblity of any particular portion of the testimony.[13a]

---

11. Even had witnesses testified in Court, the decision as to whether the conversation did in fact occur is difficult enough. Judge Frank has written:

"This difficulty [in fact-finding] is greatest when a trial judge tries a case in which, as to a pivotal issue of fact, the testimony is oral and in conflict. The trial judge can have no firsthand knowledge of the facts, since they happened out of his presence in the past. He must, therefore, function as a historian. To say that he 'finds' the facts is to mislead; the facts, for him, are not 'data,' that is, 'given,'—are not waiting somewhere, ready-made, for him to discover. In a very real sense the facts are, for a judge, a matter of 'opinion,' not of 'knowledge.' His 'findings' of fact necessarily derive from his appraisal of the stories the witnesses tell him about those past facts. The witnesses, in turn, being human, are fallible reporters: they may have mistakenly observed the events concerning which they testify; they may mistakenly recollect their observations; they may mistakenly (deliberately or unintentionally) report those recollections in court. The trial judge is but a witness of the words and conduct of the witnesses. He, also human, may be fallible in such witnessing. And when the witnesses tell him discrepant stories, he must, as best he can, surmise which (if any) of them honestly and accurately reported the facts. In sum, his notion of the facts comes from his subjective, fallible reaction to the subjective, fallible reactions of the witness to the actual, objective facts. Considering the multiple subjectivity of this process, it is misdescriptive to speak of the trial judge as 'finding' the facts.

"In making his guess as to the credibility of the several witnesses, the trial judge necessarily takes into account their demeanor—their gestures, their facial expressions, their intonations. Because these aspects of oral testimony vanish when the testimony is recorded on paper, in our legal system we wisely assign to the trial judge, as his peculiar and exclusive function, the ascertainment of the facts in cases where witnesses testify orally, and especially where the testimony—as it is in most lawsuits." Frank, "Say it with Music," 61 Harv.L.Rev. 921, at 923, 924 (1948).

12. S. E. C. v. Glass Marine Industries, Inc., D.C.Del., 194 F.Supp. 879, 885.

13. Plaintiff has submitted a separate Law Brief arguing admissibility and places particular emphasis on such investigative-testimony of Hayden Leason as may impeach his later deposition-testimony with respect to the alleged "Lancer Deal." See, pp. 53, 55-57, SEC Brief; see, Section IV, infra.

13a. The Court notes, as it has previously (S. E. C. v. Glass Marine Industries, Inc., D.C.Del., 194 F.Supp. 879, 884) Judge Morris' persuasive statement that: "* * * Of necessity, in investigatory proceedings, frequently, and in grand jury proceedings uniformly, the examination of witnesses does not include cross-examination. *Such testimony for that reason is not to be disregarded*, as defendants and intervenors contend, *but it must be subjected to the strictest scrutiny* for possible ambiguity and equivocation." (emphasis supplied). S. E. C. v. Harrison, D.C.D.C., 80 F.Supp. 226, 232.

## II. *The Registration Statement*

3. The Registration Statement of Glass Marine became effective July 6, 1960. On July 7, 1960, the underwriting was commenced with Leason & Co., Incorporated, as managers, and Bala, Williams & Co. and William Robinson & Co., as underwriters. By the afternoon of that day the entire issue had been sold out through 22 participating dealers in 7 states.[14] On July 13, 1960, Nicholas Savaiano, president of Glass Marine, went to the Chicago office of Leason & Co. to meet with Harvey Leason of that company and father of Intervenor Hayden Leason. The purpose of the meeting was to sign a cross-receipt for delivery to the underwriters of the 300,000 shares and the delivery to Glass Marine of the net proceeds of the offering in the amount of $451,000.[15]

A total of $451,000 was received by the Company from the investing public. Apparently, not over $1200 of the $100,000 ear-marked for plant construction was used for such purpose,[16] and this only for the clearing of rubbish from the plant site which was done prior to the offering. Only $10,000 of the $50,000 allocated to a build-up of inventory was so expended. All this amount was for expenses incurred in the construction of the prototype boat for the Hydrojet.[17] The Prospectus had stated that $120,000 would be expended for the acquisition or installation of production facilities; with the exception of "a few thousand dollars at best," no funds were so expended.[18] No part of the $30,000 allocated to acquiring dies, jigs, and fixtures, or of the $50,000 allocated for grinders, drill presses, and other tools, or of the $23,000 for spraying equipment, or of the $41,-000 for overhead conveyor equipment, was ever spent for any of such purposes.[19] $150,000 was allocated to advertising and promotional items; from $7500 to $15,000 was expended for such purposes.[20]

4. Plaintiff thus claims that a maximum of not over $26,200 of the $451,-000 received from the investing public was actually utilized as represented and concludes that even this amount was expended in a manner more consistent "with the business of a further 'promotion' than the promotion of the business." [21] Defendants retort that the Registration Statement was actually filed on April 25, 1960 and that the backlog of statements filed caused its Statement to become effective as late as July 6 (instead of the statutory waiting period of 20 days after filing). By July, defendants claim, the boat industry had fallen into a violent and wholly unexpected downward spiral. The Annual Report for 1960 of the Bueler Corporation, one of the largest and best established companies in the field of water jet propulsion, states that an "unusually drastic and sudden decline in industry sales" [22] caused its Turbocraft Division to contract its operations as rapidly as possible. Defendants maintain that these changed conditions brought about the changes in corporate policy from what the Prospectus had promised and that any and all acts by defendant corporation after the slump cannot be attributed to it at the time the Prospectus was issued.

Both contentions are credible. When a Prospectus is filed, followed as little as this one, and deviated from as quickly as this one,[23] an inference of fraud may result. Too, changed business conditions

14. Registration Statement, Prospectus Portion; Harvey Leason, Tr. pp. 11, 12; PX 133.

15. Savaiano Tr. pp. 123, 165, 166; PX 219.

16. Savaiano Tr. pp. 318, 319.

17. Savaiano Tr. pp. 319, 320.

18. Ibid. p. 320.

19. Ibid. pp. 320–325.

20. Ibid. pp. 325–329.

21. SEC Brief, p. 92.

22. DX 42, p. 3; R. G. Skinner, a stockholder, promoter and director of Hydrojet Marine Corporation, also testified as to the acute conditions faced by the industry in July, 1960. Skinner, Tr. pp. 43–45.

23. See Section IV, infra.

immediately after a public offering is made may lead to a permissible degree of deviation of corporation action from that originally contemplated.[24] Detailed analysis is thus required of actions of the corporation and the Intervenor before and after July 6, 1960, to determine, as correctly as is possible, what intent existed at the time when the offer of stock became public.

### III. *Background to Registration*

5. The SEC contends the machinations of four corporations must be studied before the nature of the allegedly fraudulent intentions of the defendants can be properly comprehended.

6. The first of these corporations is Amphibious Boats, Inc., a Texas corporation, which, by the fall of 1959, had commenced manufacture of both outboard powered boats and preparation of a land-sea "amphibion" boat.[25] In September, 1959, Hayden Leason entered into negotiations with the officers and directors of Amphibious with respect to the possible acquisition by him of both an Illinois distributorship for the company's boats and an interest in its capital stock.[26] By mid-November 1959, he had acquired substantial amounts of stock of Amphibious and in early December he was elected a director.[27]

Among companies considered for acquisition by Amphibious was Glass Crafts Boats, Inc., of Humboldt, Iowa. Prior to January, 1960, however, the Amphibious directors abandoned their

consideration of such direct acquisition upon their determination that they did not have sufficient liquid assets to utilize its assets.[28] By this time, however, a need for capital had become acute and the corporation continued to search for a source of funds. Between February 17, 1960 and March 5, 1960, Amphibious sold $75,000 of convertible debentures; by June 30, 1960 paid in capital was increased by $58,000 [29] and earnings deficit of the corporation was reflected on the capital account as increased by $72,000. About March 16, the Amphibious manufacturing plant at Irving, Texas, was destroyed by fire and thereafter the company's financial picture progressively worsened [30] until, by the end of May, the corporation was without effective direction.[31] Toward the end of May, Hayden Leason, speaking for Amphibious, telephoned Louis Piana and asked Piana if he would accept a management position with Amphibious.[32] On May 31, Piana became the general manager of Amphibious; on June 15, he was elected a director and president. Thus, on July 6, the effective date of registration, Amphibious had a new president, but lay in sad financial straits.

7. The second company the SEC asks the Court to consider prior to the public offering is Glass Craft Boats, Inc., an Illinois corporation and predecessor of Glass Marine Industries. In January, 1960, Hayden Leason, Leason & Co., William Robinson, Bala Williams, Jr.,

---

24. Such deviation may subject the corporation to a multiplicity of stockholders' suits (as Hanley v. Leason, C.A. #1362, Del. Chancery Court), but need not of itself indicate fraudulent motives at the time the Prospectus was issued. As the Commission has stated in a previous case:

"The contention of the registrant is to the effect that its statements of intention were bona fide as of the time when the registration statement became effective, and that any departures therefrom were due to the force of unforeseen circumstances. *Thus, the question is simply: What was the registrant's intention as of November 5, 1939* (the effective date of the registration state-

ment) *with respect to the kind of business the registrant might do?*" (Emphasis added). In the Matter of Southeastern Industrial Loan Co., 10 S.E.C. 617, 620 (1941).

25. Skinner, Tr. pp. 5–35; PX 50.

26. Skinner, Tr. p. 6; PX 50.

27. PX 54.

28. Hayden Leason, Tr. pp. 343–345.

29. PX 46; PX 59.

30. Skinner, Tr. pp. 70, 74, 76; PX 177.

31. SEC Brief, p. 8; Leason Brief, p. 6.

32. Piana, Tr. 54; Leason Brief, p. 6.

and Vertex Corporation [32a] joined together as joint venturers. A formal agreement signed by all parties provided that each of the joint venturers would contribute the sum of not to exceed $15,000 for the purpose of the initial acquisition of the assets of Glass Craft for the "principal purpose of * * * use in the continuance of manufacture and distribution of products similar in use to those now being manufactured and distributed" by Glass Craft. It also provided that it was contemplated that the assets of the joint venture would be transferred to a corporation to be formed and appointed Hayden Leason as agent to conduct the affairs of the venture.[32b]

Between December 15, 1959 and January 29, 1960, $75,000 was paid over by the joint venturers to Hayden Leason who had begun to act as manager.[32c]

About the middle of December, Hayden Leason took personal charge of the negotiations with Glass Craft and, in this connection, traveled to Humboldt, Iowa, where he carried on discussions with the president of Glass Craft and also with J. L. Campbell, Jr., a vice president of Humboldt Trust and Savings Bank.[32d] Agreement was reached on the purchase of the Glass Craft assets. However, the negotiations with the bank, in which financing had been sought for the reconstruction of the boat manufacturing plant, were less fruitful.

The reluctance of the bank to loan the money was brought to Hayden Leason's attention during his visit to Humboldt.[33] On December 31, 1959, Hayden Leason wrote to Campbell and stated, in part, the following: "Briefly, our plan consists of acquiring the physical assets of Glass Craft, rebuilding the plant and expanding production to fit in with our interest in Amphibious Boats, Inc. * * * After the acquisition of Glass Craft's assets has been completed we intend to exchange those assets for stock in a Delaware Corporation and thereafter offer for public sale approximately $500,000 worth of common stock of the Delaware Corporation. This will be only a matter of completing the necessary technical arrangements since our brokerage facilities and reputation for success in the boat field would enable us to complete the underwriting without difficulty. In the meantime, it is our intention to pay $20,000 for the Glass Craft assets and add another $55,000 to working capital. When the underwriting is complete we would use the $500,000 as expansion and acquisition funds." [34] (Italics added).

The venture was concluded with the purchase of the assets of Glass Craft for $53,000 and their transfer, together with the remaining capital of the venture, to Glass Marine Industries, Inc., in exchange for all of its stock, on or about January 25, 1960.[35]

8. Browne Window Manufacturing Company is the third corporation the SEC claims must be considered. Browne Window was a Delaware corporation, engaged in the manufacture and installation of curtain wall windows. By the end of March 1960, a reorganization plan for Browne Window and various collateral agreements with respect to it had given investment groups headed by Hayden Leason and William Robinson control of nearly 90% of Browne Window's equity.[36] Leason continued acquiring

32a. Vertex Corporation was owned and controlled by the family of E. Richard Verrill, its president, and president and General Manager of Amphibious until the election in December 1959 of new Amphibious officers, at which time Verrill became a director of Amphibious. PX 55. Verrill has described Vertex as a "corporate shell." Verrill, Tr. pp. 22, 23.

32b. PX 106, 167, 217.

32c. PX 218, 243; Robinson, Tr. pp. 81–82; Campbell, Tr. p. 37.

32d. Campbell, Tr. pp. 4–7, 37; PX 39A.

33. Campbell, Tr. p. 7.

34. PX 39A.

35. Registration Statement, Prospectus Portion, p. 7; Corp.Bell Ex. 1.

36. PX 91, 148, 149, 150, 151; Bergman, Tr. p. 44. The 90% figure is taken from

shares of Browne Window throughout the period immediately preceding and following a public offering of Glass Marine's stock.[37] On the day of the public offering, Leason purchased 15,000 shares of Browne Window, and by July 25 he had purchased 96,000 shares under an option available to him.[38]

9. Glass Marine Industries, Inc., defendant in these proceedings, is the fourth corporation the SEC asks the Court to examine in the pre-registration period. Glass Marine is a Delaware corporation, organized on January 12, 1960.[39] On January 18, 1960, the first board of directors was elected by vote of the incorporators. The board consisted of Hayden Leason, Robinson, Williams, Verrill, and Nicholas Savaiano, who had been offered the position of president and general manager by Hayden Leason.[40] At its first meeting, held on January 25, 1960, the board voted to accept the offer by the joint venturers to sell the assets of the venture to Glass Marine in exchange for 105,000 shares of its no par value common stock, which was valued for this purpose at 71¢ per share.[41]

By the end of January production of boats had reached a level of 4 per day, and the production staff had been increased. About February 1, Hayden Leason began investigating the possibility of obtaining a license for Glass Marine for a water jet boat propulsion device, the Hanley Hydrojet, then the property of Hanley Hydrojet, Incorporated, an Ohio corporation, the stock of which is owned virtually in full by Keenan Hanley and his wife, Mildred Hanley.[42] Frequent inquiries were made by Leason to Hanley with respect to affiliation between the two.[43] On March 9, Hanley signed an agreement to license the pleasure boat application of the Hydrojet in the United States to Glass Marine.[44]

During the course of negotiations with Hanley, Leason may have referred to a possible eventual merger between Amphibious and Glass Marine.[45] Letters were exchanged between Leason and Skinner, vice president of Amphibious, in which possible merger was referred to by Skinner ("Once Amphibious Boats is merged into Glass Marine * * * leads could be forwarded to the respective sales manager of that division [of the new corporation] for action.") [46] and not specifically responded to by Leason.[47]

SEC Brief, p. 20; neither Hayden Leason nor Glass Marine object to the figure.

37. Hayden Leason, Second Tr. pp. 577–579, 638–642.

38. Hayden Leason, Second Tr. pp. 638–642. These purchases had apparently commenced on June 17, 1960 pursuant to options available to Leason.

39. Registration Statement, Prospectus Portion, p. 3.

40. Savaiano, Tr. pp. 8–13; Robinson, Tr. p. 7.

41. Corp.Bell. Ex. 1.

42. Skinner, Tr. pp. 16, 19, 66; Hanley, Tr. p. 4.

43. Hanley, Tr. pp. 34–43.

44. Hanley, Tr. pp. 48–58.

45. Hanley and Skinner have testified to such conversations. Hanley, Tr. p. 37. Skinner, Tr. pp. 19, 20, 64, 75, 76. Skinner testified Leason told him "The

minute you merged Amphibious into Glass Marine, just the idea of an acquisition so soon would increase the value of the Glass Marine stock" (Skinner, Tr. p. 75) and that Leason wished to get the earnings of Amphibious up so as to be able to merge on a share for share basis (Skinner, Tr. pp. 75, 76). Leason denies Hanley's claim Leason mentioned merger to him on the telephone (Leason Brief, p. 7). He denies "[s]uch a merger * * * was even proposed" (Leason Brief, p. 10). Louis Piana, former president of Amphibious, testified there were no plans for merger (Piana, Tr. p. 27). Glass Marine concedes "exploratory discussions" had occurred (Glass Marine Fact Brief, p. 56).

46. Letter, Skinner to Leason, March 8, 1960, PX 15, identified by Leason, First Deposition, pp. 433–447.

47. Leason testified he thought Skinner's proposal of merger "worth considering" (Leason, First Tr. p. 437) but that his reply letter "was written in the sense

Glass Marine's original Registration Statement, as stated before, was filed with the SEC April 25, 1960. In April, Savaiano slowed the pace of manufacture of boats, having concluded that production was exceeding sales and some of the help was laid off.[48] Sales continued to fall; by the beginning of June the inventory of unsold boats had increased to a point at which Savaiano decided to cut the work force to 6 or 7 persons, and the corporation devoted most of its efforts to the assembly of existing hulls and decks.[49]

On June 7 a meeting was held of the Glass Marine board of directors. In the course of discussion at the meeting, consideration was given to a suggestion by Hayden Leason that Glass Marine subcontract future production of hulls and decks and limit itself to assembly, as it appeared the current year would be a poor one for the boating industry and to a further suggestion offered by Glenn Leason, brother of Hayden Leason and a "guest of the directors"[50] that the company should attempt to invest as little as possible in the way of capital investment and wherever possible anything it needed in the way of parts.[51] Hanley

contends[52] Hayden Leason, for the first time, raised the question at the meeting, "Well, what's this thing going to cost to build?"[53] An attempt was made to arrive at an estimate of the cost of producing the Hydrojet boat. Various members of the board contributed varying estimates as to costs of the components. The company utilized no working drawings of the Hydrojet.[54] Hanley further contends[55] that the meeting concluded with a remark by Hayden Leason that "Well, if it's going to cost this much we might as well not even go into it * * * we are not going to make any profit on this thing. We might as well go in and buy bonds with it, or trade in the stock or something else."[56]

On June 30, Savaiano, Hayden Leason and Harvey Leason met at the offices of Leason & Co., Incorporated, at Chicago, with counsel in attendance. The purpose of the meeting, as recited in the minutes, was to "analyze the information contained in the Prospectus and Registration Statement in order to avoid misleading information and the failure of disclosure which would be tantamount to misleading information."[57]

This meeting is described by the SEC as a "ritual"[58] and by the company as

that I thanked him for his ideas, and I stated that they were good ideas and I did not want to write a letter and say I think your ideas are bad, don't submit any more ideas. I just wanted to acknowledge his opinion and his ideas and say that consideration would be given to them. But not in the sense that whatever he said was a firm agreement between us, and there was a definite understanding between us. There certainly wasn't * * *." (Leason, First Tr. pp. 436–437).

48. Savaiano, Tr. pp. 42–43.

49. Ibid.

50. Corp.Hanley Ex. 1.

51. Savaiano, Tr. pp. 166–173.

52. It should be noted, once again, that all deposition-testimony of Keenan Hanley is subject to the same infirmities as that of Hayden Leason. Both are interested parties in the result of this litigation and when either is the only witness to rel-

evant remarks or conversations of the other—or the only witness who testifies to such remarks or conversations—extreme caution will be exercised by the Court in accepting such testimony. See, n. 6, 7, supra.

53. Hanley, Tr. p. 97.

54. Leason maintains, "Naturally, the company did not know what its costs were on the Hydrojet boat, since it had not gone into a mass production of the unit nor had it at this time, June 6, developed an acceptable and workable model which it felt it could confidently place on the public market." (Leason Brief p. 13). Drawings for the Hydrojet were in possession of Hanley, who had at that time refused Glass Marine access to them. (Savaiano, Tr. p. 161).

55. See, n. 6, 7, supra.

56. Hanley, Tr. pp. 97, 98.

57. Corp.Bell Ex. 1.

58. SEC Brief, p. 39.

"another instance of conscientious efforts of both the underwriters and the company to do a thorough job in determining that the Prospectus accurately represented the plans and intentions of the company." [59]

At the meeting Harvey Leason "soul searched" [60] Savaiano and Hayden Leason as to whether there had been any material change with respect to each item of the Registration Statement, including intended use of proceeds. Harvey Leason testified, "I was very specific and left nothing in questioning Savaiano" and Hayden Leason. [61]

On July 6, the Registration Statement of Glass Marine became effective.

10. At this point the situation as of July 7, 1960 may be surveyed. The following events had occurred.

a) Hayden Leason, as of December 31, 1959, had considered acquiring "the physical assets of Glass Craft, rebuilding the plant and expanding production to fit in with * * * [his] interest in Amphibious Boats." [62]

b) Hayden Leason had conducted "exploratory discussions" [63] with respect to eventual merger with Amphibious.

c) Hayden Leason had continued to increase his interest in Browne Window. [64]

d) Hayden Leason had achieved prominent and, at varying times, dominant positions in Amphibious, Browne Window and Glass Marine.

e) Production of boats had been severely curtailed by the time the Registration Statement took effect. [65]

f) No reference was made in the Registration Statement to either Amphibious Boats or Browne Window.

### IV. *Post Registration Activity*

11. The relevant post registration activity of Hayden Leason and Glass Marine may be more quickly stated.

On July 13, Savaiano was invited by Hayden Leason to accompany him to Texas to look into Browne Window as a prospect for merger with Glass Marine. [66] On July 17, Savaiano and Leason flew to Texas. [67] Hayden Leason there attended a board meeting of Amphibious while Savaiano waited outside and toured Amphibious' plant. [68] At the meeting, the Amphibious board authorized the borrowing of $40,000 from Glass Marine. On hearing of the authorization, Savaiano commented to Leason that the financial statement of Amphibious was weak and that a loan did not seem propitious. Further, he questioned why if a fire insurance claim allegedly held by Amphibious was as strong as it was claimed to be, Glass Marine should even be approached for the loan. Leason replied that the loan might never come to fruition, that "it was the kind of situation where he felt that—on the one hand, Mr. Piana could be placated, and by the time—before it would be necessary for us to make a loan, the insurance claim might be paid. So on this basis,

59. Glass Marine Fact Brief, p. 60.

60. Harvey Leason, Tr. p. 10.

61. Ibid.

62. PX 39A; see, p. 734, supra.

63. Glass Marine Fact Brief, p. 56.
It should be noted that both Leason and Glass Marine emphatically maintain such intentions, of any sort, were abandoned by the effective date of registration. Leason: "But as been testified to, time after time, *Amphibious and GMI never had any definite or formulative plan,* and any combination between the two companies was completely *aban-*

*doned prior to February of 1960."* (Italics in original) Leason Brief, p. 7. Glass Marine: "There is absolutely no evidence that the Company ever *attempted* or *negotiated* a merger or consolidation with Amphibious Boats." (Italics in original). Glas Marine Fact Brief, pp. 54, 55.

64. See, pp. 734, 735, supra.

65. See, p. 736, supra.

66. Savaiano, Tr. pp. 121–122.

67. Ibid. p. 174.

68. Ibid. p. 177.

not to object right now and see what happened * * * I think [said Savaiano] I said we are burning the candle at both ends." [69]

After Savaiano returned to Chicago he went to Prospect, Ohio, where he received a letter from Piana asking for a loan, from Glass Marine for Amphibious, and then a telephone call from Piana in which Savaiano told him he would not approve such a loan. Piana asked Savaiano why he hadn't mentioned his unwillingness to grant the loan ("Well, what do you mean? You didn't say anything about it while you were in Texas.") [70] and Savaiano replied that Leason had felt the insurance company might pay before the loan would be requested and that, in any event, Savaiano did not favor the loan. Leason spoke with Savaiano and told him he thought the loan was a "fair risk to take" [71] and when Savaiano still opposed the loan, Leason said, "Oh well, I'm kind of fed up with it anyway. You do what you think about that problem." [72]

On July 26 a meeting of the board of directors of Browne Window was held at the call of Hayden Leason, its chairman. The following resolution was adopted:

"RESOLVED, that the Board will discuss an offer from Glass Marine in regard to the possible merger of the Browne Window Manufacturing Co., Inc., with the Glass Marine Industries; establish a stockholder committee consisting of Hayden Leason, William B. Robinson * * *.[73]

Further resolutions were passed authorizing Browne Window's officers to borrow money from Glass Marine and to enter a "joint venture" with it as respects bonding.[74]

On August 3, the board of directors of Glass Marine met at six o'clock in the evening. Williams, Robinson, Hayden Leason, Hanley, Moore, and Savaiano were present, together with Geary Leason. Topics discussed included a loan to Amphibious, expenditures of Glass Marine, and Glass Marine's relationship to Browne Window.[75]

Savaiano agreed to make the loan to Amphibious after he was convinced "there was some kind of a Board opinion" rendered in favor of it.[76] Before it was rendered the fact that Hayden Leason and others on the board of Glass Marine had financial interests in Amphibious and Browne Window was expressed by them.[77]

The discussion with respect to Glass Marine expenditures was more acrimonious. Leason, Williams and Robinson favored a "tight money policy" [78] toward the boat building industry, and Leason became angered when told of a $300 expenditure on pictures and artwork for a catalog in preparation for the following season.[79]

When the discussion reached Browne Window, Robinson and Hayden Leason advised the other directors of their financial interests in Browne Window. Hayden Leason proposed that Glass Marine authorize various interim loans to

---

69. Ibid. p. 179.

70. Ibid. p. 193.

71. Ibid. p. 194.

72. Ibid.

73. PX 78.

74. Ibid.

75. Savaiano, Tr. pp. 197–243; Hanley, Tr. pp. 130, 131.

76. Savaiano, Tr. p. 239.

77. Ibid. p. 236.

78. Ibid. pp. 417–418.

79. Tr. pp. 92–96 (Testimony of Moore).
 Leason states: "It seemed quite rediculous at that time to invest such a sum of money in catalogs for boats which Moore was unable to sell. The better course of action which no one at the meeting disputed was to develop the Hydrojet boat for the fall trade show and to couple the Hydrojet with GMI's outboard line to offer both boats at once to the various dealers. Such a sales program did not require elaborite catalogs or the considerable expenditure to publish such catalogs." (sic) Leason Brief, p. 19.

Browne Window and consider a merger with it. The loan proposal was adopted 3–0 with the directors having a financial interest in Browne Window not voting.[80]

Late in the evening, a "sheaf of papers about an inch and a half thick"[81] were signed at the meeting by the board. Leason claims the documents were "previous minutes and other routine business";[82] Savaiano apparently cannot recall what the papers were except that he thought routine papers had been signed earlier in the evening;[83] the SEC contends that the papers (which none of the non-financially involved board members chose to read)[84] contained authorizations with respect to merger between Glass Marine and Browne Window.[85]

The minutes of the August 3rd meeting reflect resolutions among others to cease conventional boat production for the time being, to negotiate for a merger with Browne Window, to proceed with development of the Hydrojet boat (followed by a discussion of suggestions that arrangements be made for subcontracting its production and assembly), and authorizing loans to Browne Window to a limit of $75,000 and a loan to Amphibious in the amount of $30,000, as well as the seeking of leased quarters.[86] On August 4, Hayden Leason wrote to the officers and directors of Browne Window as follows:

"On August 3, 1960 at a Directors Meeting of Glass Marine Industries Inc., a resolution of Glass Marine Industries Inc. Board to approve the merger of Glass Marine Industries Inc. and Browne Window Mfg. Co., Inc., on the basis described in the accompanying schedule was passed.

"The Executive Committee of Browne Window Mfg. Co., Inc. has approved a similar resolution subject to the confirmation at the next meeting of directors."[87]

Following the meeting of August 3rd, Glass Marine commenced making loans to Browne Window, with the initial amount of $20,000 advanced against a note and assignment of receivables.[88]

On August 10, 1960, John Mayer of the SEC's regional office received a telephone call from a member of the law firm that had served as Glass Marine's counsel in the processing of the Registration Statement. In the course of the conversation, the possibility of merger between Glass Marine and Browne Window (both unmentioned by name) was discussed, the attorney requesting an expression of opinion from the SEC with respect to the merger.[89] Telephone calls continued between the SEC and counsel, and a conference was held in Washington, at which time the proposed merger was discussed.[90] Plans for merger were abandoned in September.[91]

12. In September 1960, Hayden Leason commenced negotiations with representatives of Lancer Industries, Inc., which eventually resulted in a three-way transfer of interest between Lancer, Glass Marine, and Browne Window.[92] The Court has entered a restraining order pendente lite preventing the consummation of a proposed settlement between

---

80. Savaiano, Tr. p. 235; Trial Tr. p. 85 (Testimony of Moore).

81. Hanley, Tr. p. 138.

82. Leason Brief, p. 19.

83. Savaiano, Tr. p. 232.

84. Hanley, Tr. pp. 138–140; Trial Tr. pp. 86–87 (Testimony of Moore); Savaiano, Tr. pp. 228–232.

85. SEC Brief, pp. 46–47.

86. PX 13–15.

87. PX 129.

88. PX 88.

89. Trial Tr. pp. 7–10 (Testimony of Moore).

90. Trial Tr. pp. 26–32 (Testimony of Mayer); Leason, Second Tr. p. 374, et seq.

91. Leason attributes the decision to abandon consideration of merger to Browne Window's faltering financial position, Leason, Second Tr. p. 379; the SEC infers it may have been due to fear of SEC action. SEC Brief, p. 52; SEC Proposed Findings of Fact #14.

92. See, S. E. C. v. Glass Marine Industries, D.C.Del., 199 F.Supp. 18.

Lancer and Glass Marine and extended it throughout the course of this litigation.[93] Lancer's motion to intervene in this action was granted. No complaint has been filed against Lancer by the SEC.[94] Thus the only relevance of Lancer to this cause is such light as the negotiations between Lancer and Leason/Glass Marine may shed on the pre-registration intent of Leason and Glass Marine. A survey of the evidence in this cause, *in extenso,* provides no grounds for belief that the relationship between Lancer and either of the defendants sheds any such illumination.[95]

13. Thus, in the post-registration period, the following events occurred.

a) Loans were made from Glass Marine to Amphibious.

b) Loans were made from Glass Marine to Browne Window.

c) Merger was considered between Glass Marine and Browne Window.

d) The boat building industry continued its slump and Leason and other directors of Glass Marine favored a "tight money policy" with respect to the spending of corporate funds on boats.

e) Glass Marine quickly departed from many terms of the Prospectus.[96]

## V. *Conclusions*

14. The SEC charges fraudulently false statements were contained in Glass Marine's Prospectus and Registration Statements. It also charges plans of the defendants were omitted from the Prospectus and Registration Statement which should have been included. In the first category, the SEC claims the defendants did not plan to go in the boat business, did not plan to build the Hydrojet boat, did not plan to open a factory in Humboldt, Iowa, etc. In the second, the SEC charges plans were afoot when the Prospectus was filed to lend money to Amphibious and Browne Window, to merge with Amphibious and Browne Window, etc.

 17. Intent is essential to a scheme to defraud.[97] On the basis of the evidence before me in this cause I cannot find fraudulent intent present with respect to the specific statements contained in the Prospectus. Substantial testimony has been introduced indicating that the Company's intentions and Hayden Leason's intentions were to go into the boat business as stated in the Prospectus.[98] Substantial testimony

93. S. E. C. v. Glass Marine Industries, D.C.Del., 199 F.Supp. 16.

94. The SEC has submitted proposed Findings of Law that Lancer is guilty of violating the Securities Acts. SEC "Findings of Law," 7, 8, 9. Such request for findings has not yet supplemented the requirement of filing a complaint.

95. It need hardly be added that this in no way attaches this Court's *imprimatur* to the complex and highly debatable agreement reached between Lancer and Glass Marine, which may yet be a source of litigation between Glass Marine and its stockholders. One such suit has already been filed and settled, Keenan Hanley v. Hayden Leason (C.A. #1362, Del. Chancery Court). In an earlier opinion in this cause, this Court said:
"The decision whether the negotiated Lancer settlement is a beneficial one for the corporation is not within this Court's competence to affirm or negate. Such decision is company business, to be allowed or disallowed as the legal considerations may determine, but not to be approved or disapproved by the Court on the basis of its substituted personal business judgment." S. E. C. v. Glass Marine Industries, D.C.Del., 199 F.Supp. 18, 21.

96. See Sections II and IV, supra.

97. Troutman v. United States, 10 Cir., 100 F.2d 628, 632, cert. den. 306 U.S. 649, 59 S.Ct. 590, 83 L.Ed. 1047; Rice v. United States, 10 Cir., 149 F.2d 601, cited in Loss, III, Security Regulation, 1440 (1961). Loss further states of these cases:
"These holdings as to intent ad scienter were made in the context of criminal prosecutions * * * but the rationale of these holdings would seem to apply equally to injunction actions or other civil cases based on clause (1) or (3) of Section 17(a) or their counterparts in the rules." pp. 1441, 1442.
The present case was brought under Section 17(a) (1) and (3).

98. Of course, members of the board testified their intentions were to hew strictly

has been introduced indicating that substantial efforts were made to develop the boat business (and the Hydrojet) by Glass Marine.[99] Plausibly sound business reasons have been offered for the corporate decision not to locate at Humboldt, Iowa.[100]

16. Determination of the pre-registration intent of Hayden Leason and Glass Marine with respect to Amphibious and Browne Window is more difficult. Extensive testimony has been heard from directors of Glass Marine,[101] Amphibious,[102] and Browne Window,[103] that no merger was contemplated by them before registration. But such testimony is of less consequence than such acts of Hayden Leason and Glass Marine which may lead to some preponderance of the probabilities as to what the preregistration intent actually was.[104]

Hayden Leason wrote to Campbell on December 31, 1959, of "our plan * * *

to the commands of the Prospectus as of July 7, 1960. Savaiano, Tr. pp. 334, 335; Hayden Leason, 1st Tr. p. 460; Robinson, Tr. p. 150; Williams, Tr. p. 263; Geary Leason, Tr. pp. 59, 60. Corporate action is of far greater probative value than such testimony. Still, it may be weighed against the failure of the SEC to produce any evidence of statements inconsistent with the specific pledges made in the Prospectus. It may be weighed, as well, recalling George Bernard Shaw's caustic admonition that: "Hell is paved with good intentions, not bad ones. All men mean well." (Shaw, Maxims for Revolutionists).

99. Here the testimony of Savaiano is most impressive:
"* * * it is true that every possible effort insofar as I am concerned and insofar as all of facilities at my disposal are concerned was expended to develop the jet boat business on behalf of myself and the Company and all the employees whom I directed. * * * I would even go so far as to say that the employees of the Company gave in effort, time, and devotion, everything they could and that it was a lot more than ordinarily could be expected * * if you call 18, 20 hours a day, seven days a week for three or four weeks at a stretch with no additional pay more than is normal * * *." (p. 534).
Other testimony of Savaiano is at 580–582 and throughout his lengthy and convincing deposition. Other relevant testimony is by Hayden Leason, 2d Tr. p. 598; Richard Moore, Trial Tr. pp. 72–74, 96–104; Geary Leason, Tr. p. 54. Apparently the statement of the SEC that "No development work was done on the Hydrojet" (SEC Brief, p. 33) is untrue.

100. Savaiano testified at length as to reasons for the decision to shift the factory from Humboldt, Iowa, to South Beloit, Ill. Savaiano, Tr. pp. 104–109, 435–442, 450–452, 470–472. See also, Hayden Leason, 2d Tr. p. 440. Reasons given for the shift include more advantageous location to the Chicago labor market in South Beloit, cheaper facilities available in South Beloit, and more space available in South Beloit. The SEC offers no convincing counter-argument as to why this particular statement would have been chosen to be included in the Prospectus if Leason/Glass Marine's intentions were to locate elsewhere.

101. Glass Marine board members testified there was no pre-registration intent to merge with Amphibious: Savaiano, Tr. pp. 587, 588; Hayden Leason, Tr. p. 458; Robinson, Tr. p. 155; Williams, Tr. p. 254; Moore, Trial Tr. pp. 72, 75; Geary Leason, Tr. p. 41.
Glass Marine board members testified there was no pre-registration intent to loan money to Amphibious: Hayden Leason, Tr. p. 458; Robinson, Tr. p. 155; Williams, Tr. p. 257; Moore, Trial Tr. pp. 72, 75.
Glass Marine board members testified there was no pre-registration intent to loan money to or merge with Browne Window: Savaiano, Tr. pp. 153, 154, 155; Robinson, Tr. pp. 128, 155; H. Leason, Tr. p. 458; Williams, Tr. p. 257; Moore, Trial Tr. pp. 72, 75; Geary Leason, Tr. p. 41.

102. Amphibious directors testified there was no pre-registration intent to merge with or borrow money from Glass Marine: Bergman, Tr. pp. 56, 57; Piana, Tr. pp. 113, 118, 124, 125; Sammons, Tr. pp. 18, 19.

103. Browne Window directors testified there was no preregistration intent to merge with or borrow money from Glass Marine: Corn, Tr. pp. 64, 70; Dudley, Tr. p. 110.

104. Justice Story has written: "It would be in vain to administer justice * * * if mere statements of intention would outweigh the legal effects of the acts of the parties." The Nereide, 9 Cranch (13 U.S.) 388, 444, 3 L.Ed. 769.

(to acquire) the physical assets of Glass Craft * * * to fit in with our interest in Amphibious Boats"; [105] in March, 1960, he engaged in correspondence with Skinner in which the latter talked of merger, and Leason, at least, thought it "worth considering"; [106] by July 7, 1960, he had increased his interest in Browne Window.[107] The Registration Statement contained no reference to Browne Window or Amphibious. Within two weeks of the Registration Statement becoming effective, the Amphibious board (at a meeting attended by Hayden Leason) authorized borrowing money from Glass Marine.[108] Within three weeks of registration, the board of directors of Browne Window (at a meeting called by Hayden Leason) authorized discussion of "an offer from Glass Marine in regard to the possible merger of Browne Window * * * with Glass Marine," [109] and authorized Browne Window to borrow from Glass Marine.[110] Within a month of registration, the Glass Marine board agreed to loan money to Amphibious [111] and Browne Window.[112] The following day Hayden Leason wrote to Browne Window that the Glass Marine board of directors had, as well, approved a merger between it and Browne Window.[113]

Thus, the time factor weighs heavy against Hayden Leason's claim of innocent non-representation of Amphibious and Browne Window in the Prospectus. Leason's interests were major in both corporations at the time the Prospectus was issued. He had, prior to registration, considered merger with and/or loans to Browne Window and Amphibious. More incriminating yet is the unseemly haste with which he rushed Glass Marine into making or considering agreement after agreement with these corporations. All these factors strongly tend to negate Leason's claim of post-registration change of mind and, in fact, place Hayden Leason on the very lip of fraud.

17. Yet, the web of incriminating evidence which envelops the actions of Hayden Leason is not quite strong enough to hold. No convincing evidence has been introduced of any statement made by Hayden Leason between December 31, 1959 and the April-July 1960 registration period indicating a pre-registration intent to have Glass Marine merge with or lend money to Amphibious or Browne Window for his own aggrandizement. No convincing evidence has been introduced of post-registration intent. The SEC comes to this case as accuser; Leason as the accused.[114] Hayden Leason has committed acts of questionable corporate morality prompted by dubious, perhaps devious, intent. But the civil sanctions of the Securities Acts are punitive, even quasi-criminal, and the picture of Hayden Leason presented to me is as consistently that of a painfully unsophisticated party in the area of corporate endeavors, totally lacking in that delicate sensitivity required of a corporate endeavors, totally lacking in that delicate sensitivity required of a corporate manager vis-a-vis his public stockholders, as that of a party guilty of

105. PX 39A.

106. Leason, First Tr. p. 437; see n. 47, supra.

107. See, Section III, supra.

108. Savaiano, Tr. p. 179.

109. PX 78.

110. Ibid.

111. PX 13–15; Savaiano, Tr. p. 239.

112. PX 13–15; Savaiano, Tr. p. 235.

113. PX 129.

114. In Magnolia Petroleum Co. v. National Labor Relations Bd., 5 Cir., 112 F.2d 545, 548, the Court said:

"In sponsoring the charges of Oil Workers' International Union, No. 243, and issuing its complaint thereon, the Board was acting purely in its *accusatorial capacity* and in that capacity it, of course, had the burden of proof to establish before itself, in its capacity as trier, the accusations it had laid. *In its capacity as accuser, the Board like any other 'person on whom the burden of proof rests to establish the right of a controversy, must produce credible evidence from which men of unbiased minds can reasonably decide in his favor.'* " (Emphasis added).

fraud. The weight of the credible evidence presented to me is thus insufficient to bring about imposition of punitive civil sanctions of the Securities Acts. Had Keenan Hanley or R. G. Skinner testified personally as to Leason's alleged statements to them in March 1960 with respect to merger and had the Court believed such testimony, this testimony plus these acts might have occasioned a different result. Too, had Nicholas Savaiano testified personally and the Court disbelieved such testimony, the result here might be different.

On this record, however, I cannot find Hayden Leason guilty of the violations with which he is charged. As stated, supra, the materials at hand consisted, for the most part, of a paper record. The trial of this cause was without a live *dramatis personae*. The record in this case before me, only in print, or typescript, will be the same record available for the appellate courts to examine. And, under the circumstances, they are free to reach a different result, for neither they nor I, as I have suggested, have had the benefit of evaluating the spoken testimony of live witnesses, and such appellate review will not suffer the orthodox stricture of appellate judges bound by the fact-finding process of the trial judge, who ordinarily has had the opportunity of testing the credibility of witnesses, etc. etc. An appellate result different from that reached here would give me no critical concern.

18. As Hayden Leason has not been found to have violated the Securities Acts, the Court need not consider arguments made as to whether his acts were those of the defendant corporation *quâ* corporation, or whether he alone is responsible for them. I find the corporate defendant Glass Marine Industries, Inc., has also not violated the Securities Acts as charged.

** The opinion herein incorporates the findings and conclusions required under Fed. R.Civ.P. 52, 28 U.S.C.A.

1. See, also, Kizziar v. Dollar, 10 Cir., 268 F.2d 914, 918; Williams v. Nichols, 4 Cir., 266 F.2d 389, 391; Kithcart **v.**

Appropriate orders may be submitted.**

## On Plaintiff's Motion for a New Trial

Since the Court filed its opinion on the merits, SEC v. Glass Marine Industries, Inc., D.C.Del., plaintiff filed its motion for a new trial under F.R.Civ.P. 59 (a) (2), 28 U.S.C. on the grounds of newly discovered evidence. Defendant and intervenor resist the motion because 1. the alleged newly discovered evidence is cumulative and would probably not produce a different result; 2. there is nothing to indicate reasonable diligence on plaintiff's part; and 3. the evidence now sought to be introduced has questionable admissibility.

LEAHY, Senior District Judge.

Principles governing disposition of a plaintiff's motion for a new trial were stated by this Court in Eastern Air Lines v. United States, D.C.Del., 110 F. Supp. 499,[1] at page 500 (per Leahy, J.):

"Motions for a new trial are addressed to the discretion of the court. Newly discovered evidence refers to evidence of facts existing at the time of trial of which the aggrieved party was excusably ignorant. The application for a new trial will be denied where the degree of activity which led to the discovery of the evidence post-trial would have produced it had it been exercised prior to trial. To support a motion for a new trial on the ground of newly discovered evidence, the evidence must have been discovered since trial, is not cumulative, is material, and the production of such evidence will probably produce a different result. A discretion to reopen a case for the taking of additional testimony should be exercised only where circumstances show justification. Failure of a par-

Metropolitan Life Insurance Co., 8 Cir., 119 F.2d 497, 500; Baird v. Aluminum Seal Co., W.D.Pa., 149 F.Supp. 874; Pioneer Paper Stock Co. v. Miller Transport Co., D.C.N.J., 109 F.Supp. 502, 504.

ty to call *available witnesses* to meet issues raised at trial does not justify the reopening of a case after decision upon the merits.

\* \* \* \* \*

"Judge Kalodner stated the rule succinctly in Reed v. Kellerman, D.C.E.D.Pa., 2 F.R.D. 195, 197: 'A motion for a new trial on the ground of newly discovered evidence must show that the evidence was discovered since the trial, and must also show facts from which the court may infer *reasonable diligence* on the part of the parties moving for new trial, that the evidence is material and not merely *cumulative or impeaching*, and that the evidence will probably produce a different result on a new trial.' "

■ 1. Plaintiff has filed the affidavit of Herbert N. Boerner in support of its motion. Affiant states he had a telephone conversation with Hayden Leason in the early part of February, 1960, re possibility of a Glass Marine—Amphibious Boats merger. The time reference is a recollection of the Chicago Boat Show exhibition. The relevancy or impact of this newly discovered evidence, when placed in juxtaposition with the proofs already adduced at trial, are consistent with all such proofs. The proffer of Boerner's testimony is, at best, cumulative; and I cannot see how it could change the results already reached in the filed opinion and findings.

2. The moving papers contain no fact recitals from which a reasonable inference can be made indicating diligence on the part of plaintiff in discovering the alleged newly discovered evidence; on the contrary, such explanations as do appear why the proposed Boerner testimony was not available, are far from persuasive.

3. I have doubt as to the admissibility of the so-called new evidence. It relates to a telephone conversation which Boerner alleges he had with Leason between February 5 and 13, 1960, when the latter was making ready to take a trip. Leason cannot recall the conversation; but he denies Boerner's identification of the alleged telephone conversation because, during that period, he had no plans whatsoever to take a trip. Moreover, as to the admissibility of telephone conversations, they do not authenticate themselves;[2] and the lack of authenticity, here, is found in the circumstance that Boerner himself admits "he never met Hayden Leason before or since and had no way of identifying the voice;" and the further circumstance that Boerner did not place the call himself but had someone else, whom he could not identify, do this for him, raises a substantial caveat as to admissibility.

Under Eastern Air Lines, supra, plaintiff has failed to support its motion. Hence, an order may be submitted dismissing plaintiff's motion for a new trial and for the reopening of the case.

---

2. U. S. v. Bucur, 7 Cir., 194 F.2d 297, 304; People v. Coultas, 342 Ill.App. 58, 95 N.E.2d 517; Wyckoff v. Jarrell, 5 W.W. Harr. 542, 35 Del. 542, 170 A. 802.